**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY, and GEICO CASUALTY CO.,

                      Plaintiffs,                            **Jury Trial Demand**

      -v-

CHIROPRACTIC CLINICS OF SOUTH FLORIDA, PL,
MEDLINK NOW, LLC, SOUTH FLORIDA DIAGNOSTIC
GROUP, LLC, GARRETT R. WEINSTEIN, D.C., P.A.,
GARRETT R. WEINSTEIN, D.C., DAVIN R. BARBANELL,
D.C., P.A., DAVIN BARBANELL, D.C., KEREN H. GOMEZ,
D.C., P.A., KEREN GOMEZ, D.C., DEAN M. ZUSMER, D.C.,
P.A., and DEAN ZUSMER,

                      Defendants.

_____/

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs"), as and for their Complaint against Defendants Chiropractic Clinics of South Florida, PL ("Chiropractic Clinics of South Florida"), Medlink Now, LLC ("Medlink"), South Florida Diagnostic Group, LLC ("South Florida Diagnostic"), Garrett R. Weinstein, D.C., P.A. ("Weinstein PA"), Garrett R. Weinstein, D.C. ("Weinstein"), Davin R. Barbanell, D.C., P.A. ("Barbanell PA"), Davin Barbanell, D.C. ("Barbanell"), Keren H. Gomez, D.C., P.A. ("Gomez PA"), Keren Gomez, D.C. ("Gomez"), Dean M. Zusmer, D.C., P.A. ("Zusmer PA"), and Dean Zusmer ("Zusmer")(collectively, the "Defendants"), hereby allege as follows:

    1.      This action seeks to recover more than $2,820,000.00 that the respective

Defendants wrongfully obtained from GEICO by submitting:

(i)      thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Chiropractic Clinics of South Florida for purported chiropractic services, physical therapy services, patient examinations, and "extracorporeal shockwave" treatments ("shockwave treatments");

(ii)     hundreds of fraudulent and unlawful PIP insurance charges through Medlink for purported patient examinations, "self-care" training, and interventional pain management services; and

(iii)    hundreds of fraudulent and unlawful PIP insurance charges through South Florida Diagnostic for purported diagnostic imaging services, particularly MRIs (the purported patient examinations, chiropractic/physical therapy services, shockwave treatments services, "self-care" training, interventional pain management, and diagnostic imaging services are hereinafter collectively referred to as the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided to individuals who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO PIP insurance policies ("Insureds").

3.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent, and unlawful PIP claims that the respective Defendants have submitted through Chiropractic Clinics of South Florida, Medlink, and South Florida Diagnostic.

4.      As set forth herein, the Defendants were never entitled to receive payment on the PIP insurance claims that they submitted to GEICO, because:

(i)      the Defendants operated Chiropractic Clinics of South Florida, Medlink, and South Florida Diagnostic in violation of Florida law, thereby rendering the Defendants ineligible to collect PIP insurance benefits in the first instance, and rendering the Defendants' PIP insurance charges noncompensable and unenforceable;

(ii)     the Fraudulent Services were unlawfully provided and unlawfully billed to GEICO, rendering the Defendants' PIP insurance charges noncompensable and unenforceable;

2

(iii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received the Fraudulent Services;

(iv)    in many cases, the Fraudulent Services were never legitimately provided in the first instance; and

(v)    the Defendants' billing for the Fraudulent Services misrepresented and exaggerated the nature, extent, results, and medical necessity of the Fraudulent Services, in order to fraudulently and unlawfully inflate the charges submitted to GEICO.

5.    The charts annexed hereto as Exhibits "1" – "3" set forth large, representative examples of the fraudulent claims that have been identified to-date that the respective Defendants submitted to GEICO by mail through Chiropractic Clinics of South Florida, Medlink, and South Florida Diagnostic.

6.    The Defendants' fraudulent and unlawful scheme began no later than 2020 and has continued uninterrupted since that time. As a result of the Defendants' fraudulent and unlawful scheme, GEICO has incurred damages of more than $2,820,000.00.

**PARTIES**

I.    **Plaintiffs**

7.    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and issue automobile insurance policies in Florida.

II.    **Defendants**

8.    Defendant Chiropractic Clinics of South Florida is a Florida professional limited liability company with its principal place of business in North Miami, Florida. Chiropractic Clinics of South Florida was organized on August 20, 2012, and was used as a vehicle to submit fraudulent

and unlawful PIP insurance billing to GEICO and other insurers.

9.      At all relevant times, Chiropractic Clinics of South Florida was owned and controlled by Defendants Weinstein PA, Gomez PA, and Barbanell PA, and had them as its members.

10.     In addition, from the date of its incorporation on August 20, 2012, until at least January 31, 2023, Chiropractic Clinics of South Florida was also owned and controlled by Defendant Zusmer PA, and had Zusmer PA as its member.

11.     Defendant Medlink is a Florida limited liability company with its principal place of business in North Miami, Florida. Medlink was organized on or about December 14, 2017, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

12.     At all relevant times, Medlink was owned and controlled by Defendants Weinstein, Gomez, and Barbanell, and had them as its members.

13.     Defendant South Florida Diagnostic is a Florida limited liability company with its principal place of business in North Miami, Florida. South Florida Diagnostic was organized on or about April 24, 2014, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

14.     From the date of its organization on or about April 24, 2014, until November 17, 2022, South Florida Diagnostic was owned and controlled by Defendants Weinstein, Gomez, and Barbanell, as well as Defendant Zusmer, and had them as its members.

15.      From November 17, 2022, through the present, South Florida Diagnostic has been owned and controlled by Defendant Chiropractic Clinics of South Florida, and has had Chiropractic Clinics of South Florida as its member.

4

16.     Defendant Weinstein PA is a Florida professional corporation with its principal place of business in North Miami, Florida. Weinstein PA was incorporated on or about June 25, 2001, and was owned and controlled by Defendant Weinstein.

17.     Defendant Weinstein resides in and is a citizen of Florida. Weinstein was licensed to practice chiropractic in Florida on January 26, 2000. Weinstein owned and controlled Weinstein PA, controlled Chiropractic Clinics of South Florida, owned and controlled Medlink, owned South Florida Diagnostic until November 17, 2022, and controlled South Florida Diagnostic, and purported to perform Fraudulent Services on behalf of Chiropractic Clinics of South Florida.

18.     Defendant Gomez PA is a Florida professional corporation with its principal place of business in Miami, Florida. Gomez PA was incorporated on or about January 4, 2008, and was owned and controlled by Defendant Gomez.

19.     Defendant Gomez resides in and is a citizen of Florida. Gomez was licensed to practice chiropractic in Florida on December 31, 2007. Gomez owned and controlled Gomez PA, controlled Chiropractic Clinics of South Florida, owned and controlled Medlink, owned South Florida Diagnostic until November 17, 2022, and controlled South Florida Diagnostic, and purported to perform Fraudulent Services on behalf of Chiropractic Clinics of South Florida.

20.     Defendant Barbanell PA is a Florida professional corporation with its principal place of business in North Miami, Florida. Barbanell PA was incorporated on or about May 26, 2006, and was owned and controlled by Defendant Barbanell.

21.     Defendant Barbanell resides in and is a citizen of Florida. Barbanell was licensed to practice chiropractic in Florida on May 30, 2006. Barbanell owned and controlled Barbanell PA, controlled Chiropractic Clinics of South Florida, owned and controlled Medlink, owned South Florida Diagnostic until November 17, 2022, and controlled South Florida Diagnostic, and

purported to perform Fraudulent Services on behalf of Chiropractic Clinics of South Florida.

22.     Defendant Zusmer PA is a Florida professional corporation with its principal place of business in Miami Beach, Florida. Zusmer PA was incorporated on or about November 22, 2005, and was owned and controlled by Defendant Zusmer.

23.     Defendant Zusmer resides in Alabama, where he is presently incarcerated, and is a citizen of Florida. Zusmer was licensed to practice chiropractic in Florida on June 20, 2005, but on September 13, 2024, his chiropractic license was permanently revoked by the Florida Board of Chiropractic Medicine. Zusmer owned and controlled of Zusmer PA, controlled Chiropractic Clinics of South Florida until at least January 31, 2023, owned South Florida Diagnostic until November 17, 2022, and controlled South Florida Diagnostic, and purported to perform Fraudulent Services on behalf of Chiropractic Clinics of South Florida.

24.     Zusmer's Florida chiropractic license was permanently revoked as the result of his conviction in the Southern District of Florida for: (i) Conspiracy to Commit Health Care Fraud and Wire Fraud, in violation of 18 U.S.C. § 1349; (ii) Health Care Fraud, in violation of 18 U.S.C. § 1347; (iii) Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks, in violation of 18 U.S.C. § 371; (iv) Payment of Kickbacks in connection with a Federal Health Care Program, in violation of 42 U.S.C. § 1320A-7b(b)(2)(A); and (v) False Statements Relating to Health Care Matters, in violation of 18 U.S.C. § 1035, in a criminal case entitled United States of America v. Dean Zusmer, S.D. Fla. Case No. 0:21-cr-60253-KMM-3.

25.     As the result of Zusmer's criminal convictions – which came as the result of his involvement in a Medicare fraud scheme – Zusmer was ultimately sentenced to six and a half years in prison, and was ordered to pay more than $1,400,000.00 in restitution.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

27.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

28.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

29.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside, and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

## I.     Overview of the Pertinent Laws Governing No-Fault Insurance Reimbursement

## A.     The Florida No-Fault Law

30.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law"), which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

31.     Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a

health care services provider may submit claims directly to an insurance company using the required claim forms – including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500" form) – in order to receive payment for medically necessary services.

**B.    PIP Reimbursement and Compliance with Florida Law Governing Health Care Practice**

32.    In order for a health care service to be eligible for PIP reimbursement under the No-Fault Law, it must be "lawfully" provided.

33.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

34.    Thus, health care services providers may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

**C.    PIP Reimbursement and Compliance with the False and Fraudulent Insurance Claims Statute**

35.    Under Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"), it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from PIP patients.

36.    Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

**D.    PIP Reimbursement and Compliance with the Florida Health Care Clinic Act**

37.    Pursuant to the Florida Health Care Clinic Act, Fla. Stat. §§ 400.990 et seq. (the

"Clinic Act"), a license issued by the Florida Agency for Health Care Administration (the "AHCA") is required in order to operate a "clinic" in Florida. The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

38.     However, the Clinic Act provides an exemption from the clinic licensure requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license. . . .

39.     Therefore, in order to qualify for this "wholly owned" exemption from the Clinic Act's clinic licensure requirements, a health care practice not only must be "wholly owned" by licensed health care practitioners – or by licensed health care practitioners together with their spouses, parents, children, or siblings – but at least one of the practitioner-owners must legitimately supervise the business activities of the practice and remain legally responsible for the practice's compliance with all federal and state laws, and the practice cannot provide health care services that are beyond the scope of the supervising practitioner-owner's license.

40.     Subject to certain exceptions that are inapplicable in this case, a health care practice that does not qualify for the "wholly owned" exemption from the Clinic Act's licensure requirements, and does not otherwise have a clinic license, operates unlawfully under Florida law.

41.     Unless operating pursuant to an exemption from the clinic licensure requirements, health care practices operating in Florida not only must obtain a clinic license, but must "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for

[certain enumerated] activities on behalf of the clinic."

42.     Among other things, a clinic medical director must be a licensed physician, and must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

43.     In this context, a clinic medical director also must "[r]eview any patient referral contracts or agreements executed by the clinic."

44.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

45.     Further, pursuant to the Clinic Act, a clinic medical director must "[s]erve as the clinic records owner as defined in [Fla. Stat. §] 456.057." Pursuant to Fla. Stat. § 456.057(10), "[a]ll records owners shall develop and implement policies, standards, and procedures to protect the confidentiality and security of the medical record," and all "[e]mployees of records owners shall be trained in these policies, standards, and procedures."

46.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and [which is] punishable as provided in, [Fla. Stat. §] 812.014."

47.     Pursuant to the Clinic Act, no health care clinic in Florida may operate without the

day-to-day supervision of a legitimate physician-medical director.

48.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensure, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

**E.      PIP Reimbursement, Massage Therapy, Massage Therapists, and Physical Therapy**

49.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting.

50.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any other services performed by massage therapists.

51.     The No-Fault Law was amended to prohibit PIP reimbursement for massage or for services performed by massage therapists in response to widespread PIP fraud involving massage services and massage therapists.

52.     Pursuant to Florida's Physical Therapy Practice Act, Fla. Stat. §§ 486.011 et seq. (the "Physical Therapy Act"), massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

53.     The Physical Therapy Act also prohibits unlicensed individuals from practicing physical therapy. While the Physical Therapy Act does provide an exception to this rule, which permits a physical therapist to delegate certain patient care activities to an unlicensed assistant,

11

this exception only applies if the unlicensed assistant works under the direct supervision of a physical therapist.

54.     Health care practices in Florida may not collect PIP Benefits for any services performed by massage therapists, or for physical therapy services that are unlawfully performed by unlicensed individuals without direct supervision by a licensed physical therapist.

**F.     PIP Reimbursement and Compliance with the Florida Patient Self-Referral Act**

55.     Florida's Patient Self-Referral Act, Fla. Stat. § 456.053 (the "Self-Referral Act"), prohibits "health care providers" from referring patients for certain "designated health services" to any entity in which a referring health care provider is an investor or has an investment interest.

56.     In this context, licensed chiropractors are defined as "health care providers" under the Self-Referral Act.

57.     Furthermore, in this context, "designated health services" include physical therapy and diagnostic imaging services.

58.     Moreover, absent certain exceptions that are inapplicable in this case, the Self-Referral Act also prohibits health care providers from referring patients to entities in which they are investors or hold investment interests for services other than "designated health services".

59.     The Self-Referral Act also provides that:

> Any health care provider or other entity that enters into an arrangement or scheme, such as a cross-referral arrangement, which the physician or entity knows or should know has a principal purpose of assuring referrals by the physician to a particular entity which, if the physician directly made referrals to such entity, would be in violation of this section, shall be subject to a civil penalty of not more than $100,000 for each such circumvention arrangement or scheme to be imposed and collected by the appropriate board.

60.     Pursuant to the Self-Referral Act, health care practices may not submit any claim for payment to any insurer for services rendered pursuant to an unlawful self-referral.

61.     What is more, health care practices that collect payments for services rendered

pursuant to unlawful self-referrals must "refund such amount on a timely basis".

62.     More generally, health care practices and providers that operate in violation of the Self-Referral Act are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

**G.     PIP Reimbursement and Medical Necessity**

63.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. At the same time, a health care provider is only eligible to receive PIP Benefits for medically necessary services.

64.     Pursuant to the No-Fault Law, "medically necessary" means:

[A] medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

> (a)     In accordance with generally accepted standards of medical practice;
>
> (b)     Clinically appropriate in terms of type, frequency, extent, site, and duration; and
>
> (c)     Not primarily for the convenience of the patient, physician, or other health care provider.

**H.     PIP Billing and PIP Reimbursement**

65.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

> (i)     for any service or treatment that was not lawful at the time rendered;
>
> (ii)     to any person who knowingly submits a false or misleading statement relating to the claim or charges;
>
> (iii)     for any treatment or service that is upcoded; or
>
> (iv)     with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

66.     The No-Fault Law's billing requirements provide that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes.

67.     The instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

68.     To "directly supervise" a service, a supervising health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

69.     Pursuant to the No-Fault Law, insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identities of the individual licensed health care practitioners who performed or directly supervised the underlying services.

70.     Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials".

71.     Pursuant to the No-Fault Law, PIP reimbursement for health care services is normally limited to $2,500.00 per injured person, unless a physician, physician assistant, or

14

advanced practice registered nurse determines that the injured person suffered from an "emergency medical condition", in which case health care providers can be reimbursed up to $10,000.00 per injured person.

72.     Pursuant to the No-Fault Law, an "emergency medical condition" means: "a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) [s]erious jeopardy to patient health[;] (b) [s]erious impairment to bodily functions[; and/or] (c) [s]erious dysfunction of any bodily organ or part."

73.     Unlike physicians, physician assistants, or advanced practice registered nurses, the No-Fault Law does not permit chiropractors to render the "emergency medical condition" diagnoses necessary to increase potential PIP reimbursement from $2,500.00 to $10,000.00 per injured person.

## II.      The Defendants' Fraudulent and Unlawful Scheme

74.     Since at least 2020 and continuing through the present day, the Defendants conceived and implemented an interrelated fraudulent scheme in which they billed GEICO and other Florida automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

## A.      The Defendants' Violations of the Clinic Act

## 1.      The Unlawful Operation of Chiropractic Clinics of South Florida in Violation of the Clinic Act

75.     Chiropractic Clinics of South Florida purported to be exempt from the Clinic Act's health care clinic licensure requirements, but operated without a valid exemption and, as a result, operated as an unlicensed health care clinic in violation of the Clinic Act.

76.     In particular, Chiropractic Clinics of South Florida was a "clinic" within the

meaning of the Clinic Act, in that it was an entity "where health care services are provided to individuals and which tender[ed] charges for reimbursement for such services".

77.     However, Chiropractic Clinics of South Florida never had a clinic license or medical director.

78.     Instead, Chiropractic Clinics of South Florida purported to operate under the "wholly owned" exemption from the Clinic Act's licensure, operating, and medical director requirements.

79.     However, Chiropractic Clinics of South Florida was not "wholly owned" by licensed health care practitioners – or by licensed health care practitioners together with their spouses, parents, children, or siblings.

80.     Instead, Chiropractic Clinics of South Florida was owned by Weinstein PA, Gomez PA, and Barbanell PA at all relevant times, and by Zusmer PA from August 20, 2012, until at least January 31, 2023.

81.     Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA are professional corporations, not licensed health care practitioners or the spouses, parents, children, or siblings of licensed health care practitioners.

82.     Even if Chiropractic Clinics of South Florida had been "wholly owned" by actual licensed health care practitioners – and it was not – no licensed health care practitioner-owner ever legitimately supervised the business activities of Chiropractic Clinics of South Florida.

83.     If a licensed health care practitioner-owner had legitimately supervised the business activities of Chiropractic Clinics of South Florida, they would not have permitted Chiropractic Clinics of South Florida to operate in the fraudulent and unlawful manner described herein.

84.     Accordingly, Chiropractic Clinics of South Florida never qualified for the "wholly

16

owned" exemption from licensure as a "health care clinic". Nor did Chiropractic Clinics of South Florida qualify for any other exemption from the Clinic Act's clinic licensure requirements, or have a medical director and clinic license as required for a health care clinic without an exemption. As a result, Chiropractic Clinics of South Florida operated – at all relevant times – in violation of the Clinic Act.

**2.    The Unlawful Operation of Medlink in Violation of the Clinic Act**

85.    Medlink purported to be exempt from the Clinic Act's health care clinic licensure requirements, but operated without a valid exemption and, as a result, operated as an unlicensed health care clinic in violation of the Clinic Act.

86.    In particular, Medlink was a "clinic" within the meaning of the Clinic Act, in that it was an entity "where health care services are provided to individuals and which tender[ed] charges for reimbursement for such services".

87.    However, Medlink never had a clinic license or medical director.

88.    Instead, Medlink was – at all relevant times – owned by Weinstein, Gomez, and Barbanell, and purported to operate under the "wholly owned" exemption from the Clinic Act's licensure, operating, and medical director requirements.

89.    However, Weinstein, Gomez, and Barbanell never legitimately supervised the business activities of Medlink. Had Weinstein, Gomez, and Barbanell legitimately supervised the business activities of Medlink, they would not have permitted Medlink to operate in the fraudulent and unlawful manner described herein.

90.    In fact, Weinstein, Gomez, and Barbanell could not have legitimately supervised the business activities of Medlink, because Medlink employed physicians and advanced practice registered nurses to provide purported medical services that were outside the scope of Weinstein,

Gomez, and Barbanell's chiropractic licenses.

91.     Accordingly, Medlink never qualified for the "wholly owned" exemption from licensure as a "health care clinic". Nor did Medlink qualify for any other exemption from the Clinic Act's clinic licensure requirements, or have a medical director and clinic license as required for a health care clinic without an exemption. As a result, Medlink operated – at all relevant times – in violation of the Clinic Act.

**3.     The Unlawful Operation of South Florida Diagnostic in Violation of the Clinic Act**

92.     South Florida Diagnostic purported to be exempt from the Clinic Act's health care clinic licensure requirements, but operated without a valid exemption and, as a result, operated as an unlicensed health care clinic in violation of the Clinic Act.

93.     In particular, South Florida Diagnostic was a "clinic" within the meaning of the Clinic Act, in that it was an entity "where health care services are provided to individuals and which tender[ed] charges for reimbursement for such services".

94.     However, South Florida Diagnostic never had a clinic license or medical director.

95.     Instead, South Florida Diagnostic purported to operate under the "wholly owned" exemption from the Clinic Act's licensure, operating, and medical director requirements.

96.     However, neither Weinstein, Gomez, Barbanell, nor Zusmer ever legitimately supervised the business activities of South Florida Diagnostic. Had Weinstein, Gomez, Barbanell, and Zusmer legitimately supervised the business activities of South Florida Diagnostic, they would not have permitted South Florida Diagnostic to operate in the fraudulent and unlawful manner described herein.

97.     In fact, neither Weinstein, Gomez, Barbanell, nor Zusmer could have legitimately supervised the business activities of South Florida Diagnostic, because South Florida Diagnostic

employed physicians to provide purported medical services that were outside the scope of Weinstein, Gomez, Barbanell, and Zusmer's chiropractic licenses.

98. Moreover, from November 17, 2022, to the present, South Florida Diagnostic has not even been "wholly owned" by licensed health care practitioners – or by licensed health care practitioners together with their spouses, parents, children, or siblings.

99. Instead, since November 17, 2022, South Florida Diagnostic has been owned by Chiropractic Clinics of South Florida.

100. Chiropractic Clinics of South Florida is a professional limited liability company, not a licensed health care practitioner or the spouse, parent, child, or sibling of any licensed health care practitioner.

101. Accordingly, South Florida Diagnostic never qualified for the "wholly owned" exemption from licensure as a "health care clinic". Nor did South Florida Diagnostic qualify for any other exemption from the Clinic Act's clinic licensure requirements, or have a medical director and clinic license as required for a health care clinic without an exemption. As a result, South Florida Diagnostic operated – at all relevant times – in violation of the Clinic Act.

**B.     The Defendants' Violations of the False and Fraudulent Insurance Claims Statute**

102. The Defendants knew that, if they made a legitimate, good-faith effort to collect PIP deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful scheme described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to Chiropractic Clinics of South Florida, Medlink, and South Florida Diagnostic for medically unnecessary treatment.

103. Accordingly, as part and parcel of their fraudulent and unlawful scheme, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a

good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

104.     In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) that the respective Defendants submitted through Chiropractic Clinics of South Florida, Medlink, and South Florida Diagnostic to GEICO for the Defendants' Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the patients.

105.     In the claims identified in Exhibits "1" – "3", the Defendants routinely and falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, the services were neither lawfully provided nor reimbursable, because the Defendants engaged in the unlawful general business practice of waiving, or failing to make a good-faith effort to collect, PIP deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

**C.     The Defendants' Violations of the Self-Referral Act**

106.     The Defendants' scheme was aimed at generating as much PIP billing as possible, per Insured, which, in turn, required the Defendants to provide large amounts of medically unnecessary Fraudulent Services to each Insured, regardless of the medical necessity of the Fraudulent Services for the Insureds.

107.     However, the Defendants knew that, if they billed for all of their Fraudulent Services through a single entity or practice, under a single tax identification number, it could draw attention to their fraudulent and unlawful PIP billing scheme.

108.     Accordingly, the Defendants caused Chiropractic Clinics of South Florida, Medlink, and South Florida Diagnostic to be formed as separate entities, with different names and

tax identification numbers, and then divided their billing for the Fraudulent Services across the three separate entities, in order to reduce the volume of billing submitted through any one entity, and thereby conceal and perpetuate their fraudulent PIP billing scheme.

109.    To facilitate their scheme, the Defendants engaged in patterns of unlawful self-referrals between and among Chiropractic Clinics of South Florida, Medlink, and South Florida Diagnostic.

**1.     The Unlawful Self-Referrals from Chiropractic Clinics of South Florida to South Florida Diagnostic for Diagnostic Imaging Services**

110.    For instance, and as set forth herein, the Self-Referral Act prohibits any health care provider from referring patients for certain "designated health care services" to any entity in which the health care provider is an investor or has an investment interest.

111.    In the context of the Self-Referral Act, Barbanell, Weinstein, Gomez, and Zusmer – as licensed chiropractors – were "health care providers".

112.    In the context of the Self-Referral Act, the putative diagnostic imaging services that South Florida Diagnostic purported to provide were "designated health care services".

113.    In the context of the Self-Referral Act, Barbanell, Weinstein, Gomez, and Zusmer were "investors" in, and had "investment interests" in, South Florida Diagnostic.

114.    As a result, Barbanell, Weinstein, Gomez, and Zusmer could not lawfully self-refer Insureds from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services.

115.    Nor could Barbanell, Weinstein, Gomez, and Zusmer lawfully cause any other health care practitioners working at Chiropractic Clinics of South Florida to self-refer Insureds to South Florida Diagnostic for diagnostic imaging services.

116.    Even so, in the claims identified in Exhibits "1" and "3", Barbanell, Weinstein,

Gomez, and Zusmer routinely and unlawfully caused health care practitioners associated with Chiropractic Clinics of South Florida, who worked at their direction, to self-refer Insureds from Chiropractic Clinics of South Florida to South Florida Diagnostic for purported diagnostic imaging services.

117.    For example:

(i)     On or about March 19, 2020, Barbanell, Weinstein, Gomez, and Zusmer caused an Insured named JP to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(ii)    On or about July 27, 2020, Barbanell, Weinstein, Gomez, and Zusmer caused an Insured named GG to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(iii)   On or about September 21, 2020, Barbanell, Weinstein, Gomez, and Zusmer caused an Insured named SW to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(iv)    On or about September 21, 2020, Barbanell, Weinstein, Gomez, and Zusmer caused an Insured named TS to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(v)     On or about January 21, 2021, Barbanell, Weinstein, Gomez, and Zusmer caused an Insured named MG to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(vi)    On or about May 17, 2021, Barbanell, Weinstein, Gomez, and Zusmer caused an

22

Insured named MM to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(vii)   On or about June 16, 2021, Barbanell, Weinstein, Gomez, and Zusmer caused an Insured named FS to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(viii)   On or about June 16, 2021, Barbanell, Weinstein, Gomez, and Zusmer caused an Insured named RS to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(ix)   On or about November 13, 2023, Barbanell, Weinstein, and Gomez caused an Insured named RG to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(x)   On or about February 14, 2024, Barbanell, Weinstein, and Gomez caused an Insured named IO to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(xi)   On or about February 14, 2024, Barbanell, Weinstein, and Gomez caused an Insured named KO to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(xii)   On or about September 6, 2024, Barbanell, Weinstein, and Gomez caused an Insured named BI to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an

unlawful self-referral.

(xiii)   On or about July 30, 2024, Barbanell, Weinstein, and Gomez caused an Insured named MS to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(xiv)   On or about July 16, 2024, Barbanell, Weinstein, and Gomez caused an Insured named NL to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(xv)   On or about February 1, 2025, Barbanell, Weinstein, and Gomez caused an Insured named MD to be self-referred from Chiropractic Clinics of South Florida to South Florida Diagnostic for diagnostic imaging services, and then caused South Florida Diagnostic to bill GEICO for the diagnostic imaging services, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

118.   These are only representative examples. In the claims identified in Exhibits "1" and "3", Barbanell, Weinstein, Gomez, and Zusmer routinely and unlawfully caused health care practitioners associated with Chiropractic Clinics of South Florida to self-refer Insureds from Chiropractic Clinics of South Florida to South Florida Diagnostic for purported diagnostic imaging services. Virtually all of the diagnostic imaging services that South Florida Diagnostic purported to provide to GEICO Insureds in the claims identified in Exhibit "3" were provided – to the extent that the services were provided at all – pursuant to the Defendants' unlawful self-referral scheme.

119.   In the claims identified in Exhibit "3", South Florida Diagnostic, Barbanell, Weinstein, Gomez, Zusmer, Chiropractic Clinics of South Florida, Barbanell PA, Weinstein PA, Gomez PA, and Zusmer PA routinely and falsely represented that the diagnostic imaging services were lawfully provided and reimbursable, when, in fact, the services were provided – to the extent that the services were provided at all – pursuant to the Defendants' unlawful self-referral scheme,

and were, therefore, not entitled to PIP reimbursement.

**2.    The Unlawful Self-Referrals from Chiropractic Clinics of South Florida to Medlink for Examinations and "Self-Care" Training**

120.    As set forth herein, absent certain exceptions that are inapplicable in this case, the Self-Referral Act also prohibits health care providers from self-referring patients for services other than "designated health services".

121.    In the context of the Self-Referral Act, Barbanell, Weinstein, and Gomez – as licensed chiropractors – were "health care providers".

122.    In the context of the Self-Referral Act, Barbanell, Weinstein, and Gomez were "investors" in, and had "investment interests" in, Medlink.

123.    As a result, Barbanell, Weinstein, and Gomez could not lawfully self-refer Insureds from Chiropractic Clinics of South Florida to Medlink for medical examinations, "self-care" training, or other services.

124.    Nor could Barbanell, Weinstein, and Gomez lawfully cause any other health care practitioners working at Chiropractic Clinics of South Florida to self-refer Insureds to Medlink for medical examinations, "self-care" training, or other services.

125.    Even so, in the claims identified in Exhibits "1" and "2", Barbanell, Weinstein, and Gomez routinely and unlawfully caused health care practitioners associated with Chiropractic Clinics of South Florida, who worked at their direction, to self-refer Insureds from Chiropractic Clinics of South Florida to Medlink for purported medical examinations, "self-care" training, and other services.

126.    For example:

(i)    On or about April 26, 2021, Barbanell, Weinstein, and Gomez caused an Insured named EA to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination and "self-care" training, and then caused Medlink to bill

GEICO for the medical examination and "self-care" training, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(ii) On or about August 11, 2021, Barbanell, Weinstein, and Gomez caused an Insured named NA to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination and "self-care" training, and then caused Medlink to bill GEICO for the medical examination and "self-care" training, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(iii) On or about November 11, 2021, Barbanell, Weinstein, and Gomez caused an Insured named AA to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination and "self-care" training, and then caused Medlink to bill GEICO for the medical examination and "self-care" training, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(iv) On or about February 24, 2022, Barbanell, Weinstein, and Gomez caused an Insured named KK to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination and "self-care" training, and then caused Medlink to bill GEICO for the medical examination and "self-care" training, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(v) On or about April 19, 2022, Barbanell, Weinstein, and Gomez caused an Insured named JM to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination and "self-care" training, and then caused Medlink to bill GEICO for the medical examination and "self-care" training, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(vi) On or about May 19, 2022, Barbanell, Weinstein, and Gomez caused an Insured named WA to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination and "self-care" training, and then caused Medlink to bill GEICO for the medical examination and "self-care" training, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(vii) On or about August 5, 2022, Barbanell, Weinstein, and Gomez caused an Insured named FM to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination and "self-care" training, and then caused Medlink to bill GEICO for the medical examination and "self-care" training, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(viii)   On or about May 11, 2023, Barbanell, Weinstein, and Gomez caused an Insured named JK to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination and "self-care" training, and then caused Medlink to bill GEICO for the medical examination and "self-care" training, which were provided – to the extent that the services were provided at all – pursuant to an unlawful self-referral.

(ix)   On or about June 16, 2023, Barbanell, Weinstein, and Gomez caused an Insured named MA to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination, and then caused Medlink to bill GEICO for the medical examination, which was provided – to the extent that the examination was provided at all – pursuant to an unlawful self-referral.

(x)   On or about August 10, 2023, Barbanell, Weinstein, and Gomez caused an Insured named AM to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination, and then caused Medlink to bill GEICO for the medical examination, which was provided – to the extent that the examination was provided at all – pursuant to an unlawful self-referral.

(xi)   On or about January 24, 2024, Barbanell, Weinstein, and Gomez caused an Insured named DM to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination, and then caused Medlink to bill GEICO for the medical examination, which was provided – to the extent that the examination was provided at all – pursuant to an unlawful self-referral.

(xii)   On or about April 17, 2024, Barbanell, Weinstein, and Gomez caused an Insured named WM to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination, and then caused Medlink to bill GEICO for the medical examination, which was provided – to the extent that the examination was provided at all – pursuant to an unlawful self-referral.

(xiii)   On or about May 15, 2024, Barbanell, Weinstein, and Gomez caused an Insured named JL to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination, and then caused Medlink to bill GEICO for the medical examination, which was provided – to the extent that it was provided at all – pursuant to an unlawful self-referral.

(xiv)   On or about September 4, 2024, Barbanell, Weinstein, and Gomez caused an Insured named EM to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination, and then caused Medlink to bill GEICO for the medical examination, which was provided – to the extent that the examination was provided at all – pursuant to an unlawful self-referral.

(xv)   On or about October 2, 2024, Barbanell, Weinstein, and Gomez caused an Insured named AK to be self-referred from Chiropractic Clinics of South Florida to Medlink for a medical examination, and then caused Medlink to bill GEICO for the

medical examination, which was provided – to the extent that the examination was provided at all – pursuant to an unlawful self-referral.

127. These are only representative examples. In the claims identified in Exhibits "1" and "2", Barbanell, Weinstein, and Gomez routinely and unlawfully caused health care practitioners associated with Chiropractic Clinics of South Florida to self-refer Insureds from Chiropractic Clinics of South Florida to Medlink for purported medical examinations, "self-care" training, and other services. Virtually all of the services that Medlink purported to provide to GEICO Insureds in the claims identified in Exhibit "2" were provided – to the extent that the services were provided at all – pursuant to the Defendants' unlawful self-referral scheme.

128. In the claims identified in Exhibit "2", Medlink, Barbanell, Weinstein, and Gomez routinely and falsely represented that the underlying services were lawfully provided and reimbursable, when, in fact, the services were provided – to the extent that the services were provided at all – pursuant to the Defendants' unlawful self-referral scheme, and were, therefore, not entitled to PIP reimbursement.

**D.** **The Fraudulent and Unlawful Billing for Physical Therapy and Shockwave Treatments Performed by Massage Therapists at Chiropractic Clinics of South Florida, and Misrepresentations/Concealment Regarding the Identities of the Actual Treating Practitioners**

129. Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer billed for a limited range of health care services through Chiropractic Clinics of South Florida, primarily consisting of purported: (i) patient examinations; (ii) chiropractic services; (iii) physical therapy services; and (iii) shockwave treatments.

130. In the claims identified in Exhibit "1", Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer

billed for: (i) the purported physical therapy services using CPT codes 97010, 97012, 97014, 97035, 97039, 97110, 97112, and 97140, and Healthcare Common Procedure Coding System ("HCPCS") codes G0283 and S8948; and (ii) the purported shockwave treatments using CPT code 0101T.

131.    In the claims for purported physical therapy services and shockwave treatments identified in Exhibit "1", the services were unlawfully performed – to the extent that the services were performed at all – by massage therapists, including individuals named Jeffrey Closter, L.M.T., Carmen Diaz, L.M.T., Walter Julian Jaramillo, L.M.T., Robert McPherson, L.M.T., Reynaldo Perez, L.M.T., and Javier Sierra, L.M.T., none of whom was licensed to practice physical therapy.

132.    Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer were aware of the fact that Chiropractic Clinics of South Florida could not lawfully recover PIP Benefits for services performed by massage therapists.

133.    As a result – and in order to conceal the fact that massage therapists performed the purported "physical therapy" and shockwave services that were unlawfully billed through Chiropractic Clinics of South Florida to GEICO – Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer: (i) deliberately omitted any reference to the massage therapists on the treatment notes and HCFA-1500 forms that they used to bill for the putative physical therapy and shockwave services; and (ii) falsely represented in the HCFA-1500 forms/bills and treatment notes that various chiropractors associated with Chiropractic Clinics of South Florida had, themselves, performed or directly supervised the services.

134. In the claims for physical therapy and shockwave services identified in Exhibit "1", Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer routinely and falsely misrepresented that the physical therapy and shockwave services were lawfully provided and reimbursable, when, in fact, the services were neither lawfully provided nor reimbursable, because:

    (i)    the purported services were performed – to the extent that the services were performed at all – by massage therapists;

    (ii)    Chiropractic Clinics of South Florida could not lawfully recover PIP Benefits for the purported services because the services were performed by massage therapists, and because Chiropractic Clinics of South Florida operated in violation of Florida law; and

    (iii)    Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer systematically and fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative services.

**E.  The Defendants' Fraudulent Treatment and Billing Protocols**

135. In the claims identified in Exhibits "1" - "3", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced.

136. Even so, in the claims identified in Exhibits "1" - "3", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to provide medically necessary treatment to the Insureds.

137. The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" - "3" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual

continuing medical problems arising from any actual automobile accidents.

138.     Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

139.     No legitimate physician, chiropractor, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described below to proceed under their auspices.

140.     The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because they sought to profit from the fraudulent billing that they submitted to GEICO and other insurers.

**1.     The Fraudulent and Unlawful Charges for Initial Examinations at Chiropractic Clinics of South Florida**

141.     As a first step in the Defendants' fraudulent treatment and billing protocols, the Insureds in the claims identified in Exhibit "1" purportedly received an initial examination at Chiropractic Clinics of South Florida.

142.     Weinstein, Gomez, Barbanell, and Zusmer, and other health care practitioners working at their direction, purported to perform the initial examinations in the claims identified in Exhibit "1".

143.     As set forth in Exhibit "1", Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer (collectively, the "CCSF Defendants") then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, typically resulting in a charge between $305.00 and $450.00 for each initial examination that they purported to provide.

31

144.     Pursuant to the American Medical Association's CPT Assistant, which governs billing and reimbursement of PIP claims, the use of CPT code 99203 to bill for an initial patient examination represents – among other things – that: (a) the chiropractor or health care practitioner who performed the examination spent at least 30 minutes of time performing the examination; and (b) the chiropractor or health care practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

145.     In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Chiropractic Clinics of South Florida's eligibility to collect PIP Benefits in the first instance.

146.     In fact, and as set forth herein, Chiropractic Clinics of South Florida was never eligible to collect PIP Benefits, inasmuch as it operated in violation of Florida law.

147.     As set forth below, the charges for the initial examinations identified in Exhibit "1" were also fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**a.     Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

148.     In the claims for initial examinations identified in Exhibit "1", the CCSF Defendants misrepresented and exaggerated the amount of time that the examining chiropractors and other health care practitioners spent performing the purported examinations.

149.     As set forth in Exhibit "1", the CCSF Defendants submitted virtually all of their billing for initial examinations under CPT code 99203, and thereby represented that the chiropractors and other health care practitioners who purported to perform the initial examinations spent at least 30 minutes of time performing the examinations.

150.     In fact, in the claims for initial examinations identified in Exhibit "1", no health

care practitioner ever spent even 15 minutes of time performing the examinations, much less 30 minutes.

151.    For instance, and in keeping with the fact that the initial examinations allegedly provided through Chiropractic Clinics of South Florida did not take more than 15 minutes of time to perform, the examining health care practitioners used templated forms in purporting to conduct the initial examinations.

152.    The templated forms that the examining practitioners at Chiropractic Clinics of South Florida used in purporting to perform the initial examinations set forth a very limited range of examination parameters.

153.    The only time performing the examination that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

154.    These brief interviews and limited examinations did not require any chiropractor or health care practitioner associated with Chiropractic Clinics of South Florida to spend more than 15 minutes of time performing the examinations.

155.    Moreover, the purported initial examinations in the claims identified in Exhibit "1" were not legitimately performed at all, inasmuch as the outcomes of the putative examinations were pre-determined to result in false soft tissue injury diagnoses and medically unnecessary treatment recommendations, regardless of the Insureds' actual individual circumstances and presentation. These false and predetermined examinations did not require the examining health care practitioners to spend more than 15 minutes of time performing the examinations.

156.    In the claims for initial examinations identified in Exhibit "1", the CCSF Defendants routinely and falsely represented that the examinations took 30 minutes of time to

perform in order to create a false basis for their charges under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that require less time to perform.

**b.  Misrepresentations Regarding the Extent of Medical Decision-Making**

157.  Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination – namely: (i) straightforward medical decision-making; (ii) low complexity medical decision-making; (iii) moderate complexity medical decision-making; and (iv) high complexity medical decision-making.

158.  Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or management options to be considered; (ii) the amount and/or complexity of the medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

159.  Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

160.  For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things, involve: (i) the review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) at least some real risk of morbidity associated

with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

161.    As set forth in Exhibit "1", the CCSF Defendants submitted virtually all of their billing for initial examinations under CPT code 99203, and thereby represented that the chiropractors and other health care practitioners who purported to perform the initial examinations engaged in legitimate "low complexity" medical decision-making in connection with the examinations.

162.    In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

163.    To the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their typically minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

164.    The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate low complexity medical decision-making.

165.    First, in the CCSF Defendants' claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

166.    When the Insureds in the claims identified in Exhibit "1" presented to Chiropractic Clinics of South Florida for "treatment", they did not arrive with any significant medical records.

167.    Furthermore, prior to the initial examinations, the CCSF Defendants and their associates did not request any significant medical records from any other providers regarding the Insureds, nor did they provide, review, or analyze any complex diagnostic tests or other information in connection with the examinations.

168.    Second, in the claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft tissue complaints, to the extent that the Insureds had any complaints arising from their typically minor automobile accidents at all.

169.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Chiropractic Clinics of South Florida and its associates during the initial examinations, to the extent that they provided any such diagnostic procedures or treatment options in the first instance.

170.    In virtually all of the claims identified in Exhibit "1", any diagnostic procedures and treatment options that the examining practitioners at Chiropractic Clinics of South Florida recommended or provided during the initial examinations were limited to a series of medically unnecessary follow-up examinations, physical therapy, chiropractic, shockwave treatment, and related services – none of which was health- or life-threatening if properly administered.

171.    Third, in the claims for initial examinations identified in Exhibit "1", the examining practitioners did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

172.    Rather, to the extent that the initial examinations were conducted in the first instance, the examining practitioners – at the direction of the CCSF Defendants – provided a substantially similar, pre-determined, and false series of soft tissue injury "diagnoses" for each Insured, and prescribed a substantially similar course of medically unnecessary treatment for each Insured.

173.    Specifically, in almost every instance in the claims identified in Exhibit "1", during the initial examinations, the Insureds did not report any serious continuing medical problems that

legitimately could be traced to an underlying automobile accident.

174.   Even so, the examining practitioners – at the direction of the CCSF Defendants – prepared initial examination reports in which they provided false, boilerplate sprain/strain and similar soft tissue "diagnoses" to virtually every Insured.

175.   Then, based upon these artificial "diagnoses", the examining practitioners – at the direction of the CCSF Defendants – directed the Insureds to undergo a series of medically unnecessary follow-up examinations, physical therapy, chiropractic, shockwave treatment, and related services, and, in many cases, caused the Insures to be self-referred to Medlink and South Florida Diagnostic pursuant to the Defendants' unlawful self-referral scheme.

176.   For example:

(i)   On February 7, 2022, an Insured named LB was involved in an automobile accident. The contemporaneous police report indicated that LB's vehicle was drivable following the accident. The police report further indicated that LB was not injured and did not complain of any pain at the scene. In keeping with the fact that LB was not seriously injured, LB did not visit any hospital emergency room following the accident. To the extent that LB experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on February 14, 2022, an examining practitioner purported to conduct an initial examination of LB at Chiropractic Clinics of South Florida. To the extent that the practitioner performed the examination in the first instance, the practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, at the direction of the CCSF Defendants, the practitioner provided LB with a false list of objectively unverifiable soft tissue injury diagnoses. Furthermore, neither LB's presenting problems nor the treatment plan provided to LB by the CCSF Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, LB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CCSF Defendants consisted of medically unnecessary chiropractic/physical therapy treatments, which did not pose the least bit of risk to LB. Even so, the CCSF Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the practitioner engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)     On September 2, 2022, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that AM's vehicle was drivable following the accident. The police report further indicated that, although AM complained of pain to his knee, he refused medical attention at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on January 17, 2023, an examining practitioner purported to conduct an initial examination of AM at Chiropractic Clinics of South Florida. To the extent that the practitioner performed the examination in the first instance, the practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, at the direction of the CCSF Defendants, the practitioner provided AM with a false list of objectively unverifiable soft tissue injury diagnoses. Furthermore, neither AM's presenting problems nor the treatment plan provided to AM by the CCSF Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, AM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CCSF Defendants consisted of medically unnecessary chiropractic/physical therapy treatments, which did not pose the least bit of risk to AM. Even so, the CCSF Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the practitioner engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On October 17, 2022, an Insured named NC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that NC's vehicle was drivable following the accident. The police report further indicated that NC was not injured and did not complain of any pain at the scene. In keeping with the fact that NC was not seriously injured, NC did not visit any hospital emergency room following the accident. To the extent that NC experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on October 28, 2022, an examining practitioner purported to conduct an initial examination of NC at Chiropractic Clinics of South Florida. To the extent that the practitioner performed the examination in the first instance, the practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, at the direction of the CCSF Defendants, the practitioner provided NC with a false list of objectively unverifiable soft tissue injury diagnoses. Furthermore, neither NC's presenting problems nor the treatment plan provided to NC by the CCSF Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, NC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CCSF Defendants consisted of

medically unnecessary chiropractic/physical therapy treatments and shockwave treatments, which did not pose the least bit of risk to NC. Even so, the CCSF Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the practitioner engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)    On February 21, 2023, an Insured named NR was involved in an automobile accident. The contemporaneous police report indicated that NR's vehicle was drivable following the accident. The police report further indicated that NR was not injured and did not complain of any pain at the scene. In keeping with the fact that NR was not seriously injured, NR did not visit any hospital emergency room following the accident. To the extent that NR experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on March 7, 2023, an examining practitioner purported to conduct an initial examination of NR at Chiropractic Clinics of South Florida. To the extent that the practitioner performed the examination in the first instance, the practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, at the direction of the CCSF Defendants, the practitioner provided NR with a false list of objectively unverifiable soft tissue injury diagnoses. Furthermore, neither NR's presenting problems nor the treatment plan provided to NR by the CCSF Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, NR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CCSF Defendants consisted of medically unnecessary chiropractic/physical therapy treatments, which did not pose the least bit of risk to NR. Even so, the CCSF Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the practitioner engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)    On June 14, 2023, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that MD's vehicle was drivable following the accident. The police report further indicated that MD was not injured and did not complain of any pain at the scene. In keeping with the fact that MD was not seriously injured, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on June 16, 2023, an examining practitioner purported to conduct an initial examination of MD at Chiropractic Clinics of South Florida. To the extent that the practitioner performed the examination in the first instance, the practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, at the direction of Chiropractic Clinics of South

Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell, the practitioner provided MD with a false list of objectively unverifiable soft tissue injury diagnoses. Furthermore, neither MD's presenting problems nor the treatment plan provided to MD by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell presented any risk of significant complications, morbidity, or mortality. On the contrary, MD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell consisted of medically unnecessary chiropractic/physical therapy treatments, which did not pose the least bit of risk to MD. Even so, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the practitioner engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)     On July 15, 2023, an Insured named LV was involved in an automobile accident. The contemporaneous police report indicated that LV's vehicle was drivable following the accident. The police report further indicated that LV was not injured and did not complain of any pain at the scene. In keeping with the fact that LV was not seriously injured, LV did not visit any hospital emergency room following the accident. To the extent that LV experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on July 21, 2023, an examining practitioner purported to conduct an initial examination of LV at Chiropractic Clinics of South Florida. To the extent that the practitioner performed the examination in the first instance, the practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, at the direction of Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell, the practitioner provided LV with a false list of objectively unverifiable soft tissue injury diagnoses. Furthermore, neither LV's presenting problems nor the treatment plan provided to LV by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell presented any risk of significant complications, morbidity, or mortality. On the contrary, LV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell consisted of medically unnecessary chiropractic/physical therapy treatments and shockwave treatments, which did not pose the least bit of risk to LV. Even so, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the practitioner engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)   On April 17, 2024, an Insured named DM was involved in an automobile accident. The contemporaneous police report indicated that DM's vehicle was drivable following the accident. The police report further indicated that DM was not injured and did not complain of any pain at the scene. In keeping with the fact that DM was not seriously injured, DM did not visit any hospital emergency room following the accident. To the extent that DM experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on May 6, 2024, an examining practitioner purported to conduct an initial examination of DM at Chiropractic Clinics of South Florida. To the extent that the practitioner performed the examination in the first instance, the practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, at the direction of Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell, the practitioner provided DM with a false list of objectively unverifiable soft tissue injury diagnoses. Furthermore, neither DM's presenting problems nor the treatment plan provided to DM by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell presented any risk of significant complications, morbidity, or mortality. On the contrary, DM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell consisted of medically unnecessary chiropractic/physical therapy treatments, which did not pose the least bit of risk to DM. Even so, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the practitioner engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)  On March 31, 2024, an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that AH's vehicle was drivable following the accident. The police report further indicated that AH was not injured and did not complain of any pain at the scene. In keeping with the fact that AH was not seriously injured, AH did not visit any hospital emergency room following the accident. To the extent that AH experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on April 5, 2024, an examining practitioner purported to conduct an initial examination of AH at Chiropractic Clinics of South Florida. To the extent that the practitioner performed the examination in the first instance, the practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, at the direction of Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell, the practitioner provided AH with a false list of objectively unverifiable

soft tissue injury diagnoses. Furthermore, neither AH's presenting problems nor the treatment plan provided to AH by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell presented any risk of significant complications, morbidity, or mortality. On the contrary, AH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell consisted of medically unnecessary chiropractic/physical therapy treatments, which did not pose the least bit of risk to AH. Even so, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the practitioner engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)     On June 29, 2024, an Insured named AO was involved in an automobile accident. The contemporaneous police report indicated that AO's vehicle was drivable following the accident. The police report further indicated that AO was not injured and did not complain of any pain at the scene. In keeping with the fact that AO was not seriously injured, AO did not visit any hospital emergency room following the accident. To the extent that AO experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on July 18, 2024, an examining practitioner purported to conduct an initial examination of AO at Chiropractic Clinics of South Florida. To the extent that the practitioner performed the examination in the first instance, the practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, at the direction of Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell, the practitioner provided AO with a false list of objectively unverifiable soft tissue injury diagnoses. Furthermore, neither AO's presenting problems nor the treatment plan provided to AO by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell presented any risk of significant complications, morbidity, or mortality. On the contrary, AO did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell consisted of medically unnecessary chiropractic/physical therapy treatments, which did not pose the least bit of risk to AO. Even so, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the practitioner engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)      On February 21, 2025, an Insured named CT was involved in an automobile accident. The contemporaneous police report indicated that CT's vehicle was

drivable following the accident. The police report further indicated that CT was not injured and did not complain of any pain at the scene. Nonetheless, the later that day, CT traveled on her own to Memorial Hospital Pembroke Emergency Department. The contemporaneous hospital records indicated that CT complained of neck pain and headache. The contemporaneous hospital records further indicated that CT was briefly observed on an outpatient basis and then discharged with no serious injury diagnosis. To the extent that CT experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on February 26, 2025, an examining practitioner purported to conduct an initial examination of CT at Chiropractic Clinics of South Florida. To the extent that the practitioner performed the examination in the first instance, the practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, at the direction of Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell, the practitioner provided CT with a false list of objectively unverifiable soft tissue injury diagnoses. Furthermore, neither CT's presenting problems nor the treatment plan provided to CT by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell presented any risk of significant complications, morbidity, or mortality. On the contrary, CT did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell consisted of medically unnecessary chiropractic/physical therapy treatments, which did not pose the least bit of risk to CT. Even so, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the practitioner engaged in some legitimate, low complexity medical decision-making during the purported examination.

177.    In keeping with the fact that these putative "diagnoses" were pre-determined and false, the CCSF Defendants frequently caused substantially similar, false "diagnoses" and medically unnecessary treatment plans to be provided, on or about the same date, to two or more Insureds who had been involved in the same underlying accident, despite the fact that the Insureds were differently situated.

178.    For example:

(i)    On March 1, 2020, two Insureds – YD and LQ – were involved in the same automobile accident. Thereafter, both Insureds presented at Chiropractic Clinics of South Florida for initial examinations on the exact same date, March 4, 2020. YD

and LQ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YD and LQ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CCSF Defendants provided YD and LQ with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ii)  On March 2, 2020, two Insureds – RC and NM – were involved in the same automobile accident. Thereafter, NM presented at Chiropractic Clinics of South Florida for an initial examination on March 3, 2020, and RC presented at Chiropractic Clinics of South Florida for an initial examination on March 9, 2020. RC and NM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RC and NM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CCSF Defendants provided RC and NM with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iii) On March 8, 2020, two Insureds – RS and HF – were involved in the same automobile accident. Thereafter, both Insureds presented at Chiropractic Clinics of South Florida for initial examinations on the exact same date, March 10, 2020. RS and HF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RS and HF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CCSF Defendants provided RS and HF with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iv)  On April 30, 2020, two Insureds – AG and MN – were involved in the same automobile accident. Thereafter, both Insureds presented at Chiropractic Clinics of South Florida for initial examinations on the exact same date, May 6, 2020. AG and MN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AG and MN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CCSF Defendants provided AG and MN with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(v)   On June 9, 2020, two Insureds – AA and ZA – were involved in the same automobile accident. Thereafter, both Insureds presented at Chiropractic Clinics of South Florida for initial examinations on the exact same date, June 10, 2020. AA and ZA were different ages, in different physical conditions, located in different

positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AA and ZA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CCSF Defendants provided AA and ZA with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vi)     On August 16, 2020, two Insureds – TS and KW – were involved in the same automobile accident. Thereafter, both Insureds presented at Chiropractic Clinics of South Florida for initial examinations on the exact same date, August 19, 2020. TS and KW were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that TS and KW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CCSF Defendants provided TS and KW with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vii)    On August 28, 2020, two Insureds – MT and JE – were involved in the same automobile accident. Thereafter, both Insureds presented at Chiropractic Clinics of South Florida for initial examinations on the exact same date, August 31, 2020. MT and JE were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MT and JE suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CCSF Defendants provided MT and JE with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii)   On September 3, 2020, two Insureds – XR and MR – were involved in the same automobile accident. Thereafter, both Insureds presented at Chiropractic Clinics of South Florida for initial examinations on the exact same date, September 11, 2020. XR and MR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that XR and MR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CCSF Defendants provided XR and MR with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ix)     On June 24, 2022, two Insureds – EO and EO – were involved in the same automobile accident. Thereafter, both Insureds presented at Chiropractic Clinics of South Florida for initial examinations on the exact same date, July 1, 2022. EO and EO were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EO and EO suffered any injuries at all in their accident,

the injuries were different. Even so, at the conclusion of the purported initial examinations, the CCSF Defendants provided EO and EO with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(x)     On July 30, 2022, three Insureds – MP, PP, and SP – were involved in the same automobile accident. Thereafter, SP presented at Chiropractic Clinics of South Florida for an initial examination on August 5, 2022, MP presented at Chiropractic Clinics of South Florida for an initial examination on August 8, 2022, and PP presented at Chiropractic Clinics of South Florida for an initial examination on August 9, 2022. MP, PP, and SP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MP, PP, and SP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CCSF Defendants provided MP, PP, and SP with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xi)    On September 22, 2022, two Insureds – MB and RM – were involved in the same automobile accident. Thereafter, both Insureds presented at Chiropractic Clinics of South Florida for initial examinations on the exact same date, October 7, 2022. MB and RM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MB and RM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CCSF Defendants provided MB and RM with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xii)   On May 20, 2023, three Insureds – EP, DP, and LP – were involved in the same automobile accident. Thereafter, EP and DP both presented at Chiropractic Clinics of South Florida for initial examinations on May 26, 2023, and LP presented at Chiropractic Clinics of South Florida for an initial examination on May 30, 2023. EP, DP, and LP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EP, DP, and LP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell provided EP, DP, and LP with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xiii)  On October 9, 2023, two Insureds – MM and BB – were involved in the same automobile accident. Thereafter, both Insureds presented at Chiropractic Clinics of

South Florida for initial examinations on the exact same date, October 23, 2023. MM and BB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MM and BB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell provided MM and BB with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiv) On October 23, 2023, three Insureds – CC, AC, and HF – were involved in the same automobile accident. Thereafter, all three Insureds presented at Chiropractic Clinics of South Florida for initial examinations on the exact same date, October 26, 2023. CC, AC, and HF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CC, AC, and HF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell provided CC, AC, and HF with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xv) On February 7, 2024, three Insureds – EG, IO, and KO – were involved in the same automobile accident. Thereafter, all three Insureds presented at Chiropractic Clinics of South Florida for initial examinations on the exact same date, February 14, 2024. EG, IO, and KO were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EG, IO, and KO suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, and Barbanell provided EG, IO, and KO with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all three of them.

179.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", the CCSF Defendants frequently caused substantially similar "diagnoses" to be issued, on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and, in any case, did not require

the treatment.

180.    The CCSF Defendants routinely caused these false "diagnoses" to be inserted into their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

181.    In the claims for initial examinations identified in Exhibit "1", the CCSF Defendants routinely and falsely represented that the putative examinations involved legitimate, low complexity medical decision making in order to create a false basis to bill for the initial examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

182.    In the claims for initial examinations identified in Exhibit "1", the CCSF Defendants routinely and fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, the examinations were neither lawfully provided nor reimbursable, because:

    (i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

    (ii)    the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

    (iii)   the CCSF Defendants were never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the CCSF Defendants operated in violation of Florida law.

**2.    The Fraudulent and Unlawful Charges for Follow-Up Examinations at Chiropractic Clinics of South Florida**

183.    In addition to their fraudulent initial examinations, the CCSF Defendants purported

to subject many of the Insureds in the claims identified in Exhibit "1" to fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

184.    Weinstein, Gomez, Barbanell, Zusmer, and other health care practitioners working at their direction purported to perform the follow-up examinations in the claims identified in Exhibit "1".

185.    As set forth in Exhibit "1", the CCSF Defendants then billed the follow-up examinations to GEICO under CPT code 99213, typically resulting in a charge between $175.00 and $300.00 for each putative examination.

186.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents that the examining practitioner engaged in medical decision-making of "low complexity" in connection with the examinations.

187.    In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented Chiropractic Clinics of South Florida's eligibility to collect PIP Benefits in the first instance.

188.    In fact, and as set forth herein, Chiropractic Clinics of South Florida was never eligible to collect PIP Benefits, inasmuch as it operated in violation of Florida law.

189.    The charges for the follow-up examinations identified in Exhibit "1" were also fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

190.    In particular, in the claims for follow-up examinations identified in Exhibit "1", no chiropractor or health care practitioner associated with Chiropractic Clinics of South Florida ever took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all in connection with the examinations.

191.    Rather, following the purported follow-up examinations, the health care practitioners

49

working at the CCSF Defendants' direction simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and (ii) either: (a) referred the Insureds for even more medically unnecessary chiropractic/physical therapy services, despite the fact that the Insureds purportedly already had received extensive chiropractic/physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (b) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

192.    The bogus "follow-up examinations" that the CCSF Defendants purported to provide to the Insureds in the claims identified in Exhibit "1" were, therefore, medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment that they walked into the Chiropractic Clinics of South Florida offices.

### 3.    The Fraudulent and Unlawful Charges for Chiropractic and Physical Therapy Services at Chiropractic Clinics of South Florida

193.    In addition to the fraudulent examinations, the CCSF Defendants virtually always purported to subject the Insureds in the claims identified in Exhibit "1" to months of medically unnecessary chiropractic and physical therapy services at Chiropractic Clinics of South Florida.

194.    Weinstein, Gomez, Barbanell, Zusmer, and other health care practitioners working at their direction purported to perform the chiropractic and physical therapy services in the claims identified in Exhibit "1".

195.    In the claims identified in Exhibit "1", the CCSF Defendants typically billed the purported chiropractic and physical therapy services to GEICO under CPT codes 97010, 97012, 97014, 97035, 97039, 97110, 97112, 97140, 98940, 98941, and 98943, and HCPCS codes G0283 and S8948.

196.    In the claims for purported chiropractic and physical therapy services identified in Exhibit "1", the charges for the chiropractic and physical therapy services were fraudulent in that they misrepresented Chiropractic Clinics of South Florida's eligibility to collect PIP Benefits in the first instance.

197.    In fact, and as set forth herein, Chiropractic Clinics of South Florida was never eligible to collect PIP Benefits, because it operated in violation of Florida law.

198.    Moreover, in the claims for physical therapy services identified in Exhibit "1", the physical therapy services were, in many cases, ineligible for reimbursement because they had been performed by massage therapists.

199.    What is more, in a legitimate clinical setting, the individual chiropractic and physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

200.    In keeping with the fact that the purported chiropractic/physical therapy services that were billed through Chiropractic Clinics of South Florida to GEICO were not medically necessary, the CCSF Defendants did not tailor the chiropractic/physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

201.    There are a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

202.    However, the CCSF Defendants routinely purported to provide substantially the same handful of chiropractic and physical therapy "treatments" to the Insureds in the claims identified in Exhibit "1", without regard for the Insureds' individual circumstances.

203.    In the claims for chiropractic/physical therapy "treatments" identified in Exhibit

"1", the CCSF Defendants routinely and fraudulently misrepresented that the services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i) the services were medically unnecessary, and were provided without regard for the Insureds' true individual circumstances and presentation;

(ii) the services had been performed by massage therapists, and the billing for the services misrepresented the identities of the actual treating practitioners; and

(iii) the CCSF Defendants were never eligible to collect PIP Benefits in connection with the services in the first instance, inasmuch as the CCSF Defendants unlawfully operated in violation of Florida law.

**4. The Fraudulent and Unlawful Charges for Shockwave Treatments at Chiropractic Clinics of South Florida**

204. Based upon the false, boilerplate "diagnoses" that the Insureds received during the purported examinations at Chiropractic Clinics of South Florida, the CCSF Defendants also purported to subject many of the Insureds in the claims identified in Exhibit "1" to one or more sessions of shockwave treatments during the course of their fraudulent treatment protocol.

205. Weinstein, Gomez, Barbanell, Zusmer, and other practitioners working at their direction purported to provide most of the shockwave treatments in the claims identified in Exhibit "1".

206. As set forth in Exhibit "1", the CCSF Defendants then billed the shockwave treatments to GEICO under CPT code 0101T, typically resulting in a charge of $450.00 for each round of shockwave treatments that purportedly was provided.

207. Like the charges for the other Fraudulent Services, the charges for shockwave treatments were fraudulent in that the shockwave treatments were medically unnecessary.

208. In keeping with the fact that the CCSF Defendants' shockwave "treatments" were medically unnecessary: (i) shockwave treatments have not been approved by the U.S. Food and

Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) Palmetto, a contractor for the Centers for Medicare & Medicaid Services ("CMS"), has published coverage guidance stating that shockwave treatments are neither reasonable nor necessary for the treatment of musculoskeletal conditions; and (iii) there are no legitimate peer-reviewed data that establish the effectiveness of shockwave treatments for the treatment of back, neck, or shoulder pain.

209.    Even so, the CCSF Defendants purported to provide medically unnecessary shockwave treatments to hundreds of Insureds pursuant to their pre-determined fraudulent treatment protocols, without regard for each Insured's individual complaints, symptoms, or presentation.

## 5.    The Fraudulent and Unlawful Charges for Examinations and "Self-Care" Training at Medlink

210.    The Defendants knew that, unless they could get physicians, physician assistants, or advanced practice registered nurses to generate "emergency medical condition" diagnoses for their patients, they not only would be limited to recovering $2,500.00 in PIP Benefits per Insured, but they would also have difficulty justifying the large amounts of medically unnecessary Fraudulent Services that they wanted to provide to the Insureds.

211.    Accordingly, in the claims identified in Exhibit "2", Barbanell, Weinstein, and Gomez routinely caused Insureds to be unlawfully self-referred from Chiropractic Clinics of South Florida to Medlink for purported examinations by physicians and advanced practice registered nurses.

212.    Then, Barbanell, Weinstein, and Gomez caused the physicians and advanced practice registered nurses who worked at Medlink to falsely diagnose the Insureds with "emergency medical conditions", in order to increase the amount of fraudulent and unlawful PIP billing that the Defendants could submit for each Insured from $2,500.00 to $10,000.00.

213.    In fact, to the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their typically minor automobile accidents, the problems were minor soft tissue injuries that did not amount to "emergency medical conditions".

**a.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

214.    As set forth in Exhibit "2", Medlink, Barbanell, Weinstein, and Gomez (collectively, the "Medlink Defendants") billed for many of their examinations using CPT code 99204, typically resulting in a charge of at least $600.00 for each examination that they purported to provide.

215.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an examination represents – among other things – that the examining practitioner spent at least 45 minutes of time performing the examination.

216.    However, in the claims for examinations identified in Exhibit "2", the physicians or advanced practice registered nurses at Medlink did not spend even 15 minutes of time performing the examinations – much less 45 minutes – to the extent that the examinations were actually conducted at all.

217.    In keeping with the fact that the examinations in the claims identified in Exhibit "2" did not involve more than 15 minutes of time, the examining practitioners used templated forms in purporting to conduct the examinations.

218.    All that was required to complete the templated forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs and a limited check of the Insureds' systems.

219.    These interviews and examinations did not require any examining health care practitioner at Medlink to spend more than 15 minutes of time performing the putative initial

examinations.

220.    In the claims for examinations identified in Exhibit "2", the Medlink Defendants routinely misrepresented the amount of time that was spent in conducting the examinations, because lengthier examinations that are billable under CPT code 99204 are reimbursable at a higher rate than examinations that take less time to perform.

**b.    Misrepresentations Regarding the Extent of Medical Decision-Making**

221.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

222.    For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must, among other things, involve: (i) the chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) the review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

223.    As set forth in Exhibit "2", the Medlink Defendants submitted much of their billing for examinations under CPT code 99204, and thereby represented that the physicians and advanced practice registered nurses who purported to perform the initial examinations engaged in legitimate "moderate complexity" medical decision-making in connection with the examinations.

224.    In actuality, the purported examinations did not involve any legitimate medical decision-making at all.

225.    To the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their typically minor automobile accidents, the problems virtually were always minor soft tissue injuries such as sprains and strains.

226.    The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate moderate complexity medical decision-making.

227.    First, in the Medlink Defendants' claims for examinations identified in Exhibit "2", the examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

228.    When the Insureds in the claims identified in Exhibit "2" presented to Medlink for "treatment", they did not arrive with any significant medical records.

229.    Furthermore, prior to the initial examinations, the Medlink Defendants and their associates did not request any significant medical records from any other providers regarding the Insureds, nor did they provide, review, or analyze any complex diagnostic tests or other information in connection with the examinations.

230.    Second, in the claims for initial examinations identified in Exhibit "2", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft tissue complaints, to the extent that the Insureds had any complaints arising from their typically minor automobile accidents at all.

231.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Medlink and its associates during the examinations, to the extent that they provided any such diagnostic procedures or treatment options in the first instance.

232.    In virtually all of the claims identified in Exhibit "2", any diagnostic procedures

and treatment options that the examining practitioners at Chiropractic Clinics of South Florida recommended or provided during the initial examinations were limited to a series of medically unnecessary follow-up examinations, physical therapy, chiropractic, shockwave treatment, interventional pain management services, and related services – none of which was health- or life-threatening if properly administered.

233. Third, in the claims for examinations identified in Exhibit "2", the examining practitioners did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

234. Rather, to the extent that the examinations were conducted in the first instance, the examining practitioners – at the direction of the Medlink Defendants – provided a substantially similar, pre-determined, and false series of soft tissue injury "diagnoses" for each Insured, oftentimes including a false "emergency medical condition" diagnosis, and recommended that the Insureds continue receiving medically unnecessary Fraudulent Services at Medlink and Chiropractic Clinics of South Florida, pursuant to the Defendants' unlawful self-referral scheme.

**c.     The Fraudulent and Unbundled Charges for "Self-Care Training"**

235. To maximize their fraudulent charges for their falsified initial examinations in the claims identified in Exhibit "2", the Medlink Defendants frequently submitted separate charges for medically useless and illusory "self-care" training under CPT code 97535, together with their examination charges under CPT code 99204.

236. The Medlink Defendants' charges for the purported "self-care" training under CPT code 97535, like their contemporaneous charges for the examinations under CPT code 99204, were fraudulent in that they misrepresented Medlink's eligibility to collect PIP Benefits in the first instance.

237.    In fact, and as set forth herein, Medlink was never eligible to collect PIP Benefits, inasmuch as it operated in violation of Florida law.

238.    The charges for the purported self-care training in the claims identified in Exhibit "2" also misrepresented the nature and extent of the alleged services.

239.    Pursuant to the CPT Assistant, the Medlink Defendants' use of CPT code 97535 to bill for "self-care" training represented that the treating practitioners provided at least 15 minutes of separately identifiable training to the patients, beyond the examinations that were billed under CPT code 99204.

240.    However, in the claims identified in Exhibit "2", the examining physicians and advanced practice registered nurses at Medlink did not provide any "self-care" training to the Insureds that was distinct from the examinations that they contemporaneously purported to provide, much less at least 15 minutes of separately identifiable training.

**6.    The Fraudulent and Unlawful Charges for Interventional Pain Management Treatments at Medlink**

241.    Pursuant to the Defendants' unlawful self-referral scheme, the Medlink Defendants also caused many of the Insureds in the claims identified in Exhibit "2" to be subjected to medically unnecessary interventional pain management treatments, including but not limited to pain management injections and nerve destruction procedures.

242.    Various physicians associated with Medlink purported to perform the interventional pain management treatments at the direction of the Medlink Defendants.

243.    As set forth in Exhibit "2", the Medlink Defendants then billed the purported interventional pain management treatments through Medlink to GEICO using CPT codes 62321, 62323, 64493, 64494, 64635, and 64636, among other codes, typically resulting in charges of more than $1,000.00 for each pain management treatment they purported to provide.

58

244.     In the claims identified in Exhibit "2", the charges for the interventional pain management treatments were fraudulent in that they misrepresented Medlink's compliance with applicable law, and misrepresented Medlink's eligibility to collect PIP Benefits in the first instance.

245.     The charges for the interventional pain management treatments were also fraudulent in that the treatments were medically unnecessary.

246.     In a legitimate clinical setting, invasive interventional pain management treatments should not be administered until a patient has failed legitimate, more conservative courses of treatment.

247.     However, in order to maximize the fraudulent PIP insurance billing that they could submit to GEICO, the Medlink Defendants purported to provide invasive interventional pain management treatments to Insureds within weeks of the Insureds' accidents, before the Insureds even had an opportunity to legitimately undergo – and fail – more conservative forms of treatment.

248.     For example:

(i)     On February 14, 2020, an Insured named ML was involved in an automobile accident. Then, on or about February 18, 2020, pursuant to the Defendants' unlawful self-referral scheme, the Medlink Defendants caused ML to be referred from Chiropractic Clinics of South Florida to Medlink. Thereafter, the Medlink Defendants purported to provide a lumbar epidural steroid injection to ML on March 6, 2020 – less than a month after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62323.

(ii)     On June 10, 2020, an Insured named TV was involved in an automobile accident. Then, on or about June 15, 2020, pursuant to the Defendants' unlawful self-referral scheme, the Medlink Defendants caused TV to be referred from Chiropractic Clinics of South Florida to Medlink. Thereafter, the Medlink Defendants purported to provide a lumbar epidural steroid injection to TV on July 13, 2020 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62323.

(iii)    On January 16, 2021, an Insured named BB was involved in an automobile accident. Then, on or about February 26, 2021, pursuant to the Defendants' unlawful self-referral scheme, the Medlink Defendants caused BB to be referred from Chiropractic Clinics of South Florida to Medlink. Thereafter, the Medlink Defendants purported to provide a cervical epidural steroid injection to BB on February 26, 2021 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62321.

(iv)    On April 10, 2021, an Insured named SM was involved in an automobile accident. Then, on or about April 22, 2021, pursuant to the Defendants' unlawful self-referral scheme, the Medlink Defendants caused SM to be referred from Chiropractic Clinics of South Florida to Medlink. Thereafter, the Medlink Defendants purported to provide a lumbar epidural steroid injection to SM on May 19, 2021 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62323.

(v)    On May 15, 2021, an Insured named AC was involved in an automobile accident. Then, on or about May 20, 2021, pursuant to the Defendants' unlawful self-referral scheme, the Medlink Defendants caused AC to be referred from Chiropractic Clinics of South Florida to Medlink. Thereafter, the Medlink Defendants purported to provide a lumbar epidural steroid injection to AC on June 7, 2021 – less than a month after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62323.

(vi)    On January 29, 2022, an Insured named FM was involved in an automobile accident. Then, on or about February 8, 2022, pursuant to the Defendants' unlawful self-referral scheme, the Medlink Defendants caused FM to be referred from Chiropractic Clinics of South Florida to Medlink. Thereafter, the Medlink Defendants purported to provide a cervical epidural steroid injection to FM on March 31, 2022 – only two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62321.

(vii)    On October 12, 2022, an Insured named CG was involved in an automobile accident. Then, on or about October 19, 2022, pursuant to the Defendants' unlawful self-referral scheme, the Medlink Defendants caused CG to be referred from Chiropractic Clinics of South Florida to Medlink. Thereafter, the Medlink Defendants purported to provide a lumbar epidural steroid injection to CG on November 29, 2022 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62323.

(viii)    On July 6, 2023, an Insured named MD was involved in an automobile accident.

Then, on or about August 23, 2023, pursuant to the Defendants' unlawful self-referral scheme, the Medlink Defendants caused MD to be referred from Chiropractic Clinics of South Florida to Medlink. Thereafter, the Medlink Defendants purported to provide lumbar facet joint block injections to MD on August 23, 2023 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injections to GEICO under CPT codes 64493 and 64494.

(ix)   On June 7, 2024, an Insured named AC was involved in an automobile accident. Then, on or about July 10, 2024, pursuant to the Defendants' unlawful self-referral scheme, the Medlink Defendants caused AC to be referred from Chiropractic Clinics of South Florida to Medlink. Thereafter, the Medlink Defendants purported to provide lumbar facet joint block injections to AC on July 10, 2024 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injections to GEICO under CPT codes 64493 and 64494.

(x)   On August 9, 2024, an Insured named EA was involved in an automobile accident. Then, on or about September 18, 2024, pursuant to the Defendants' unlawful self-referral scheme, the Medlink Defendants caused EA to be referred from Chiropractic Clinics of South Florida to Medlink. Thereafter, the Medlink Defendants purported to provide lumbar facet joint block injections to EA on September 18, 2024 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injections to GEICO under CPT codes 64493 and 64494.

249.   These are only representative examples of the Medlink Defendants' fraudulent and unlawful charges for interventional pain management treatments, which, in the majority of cases, resulted from unlawful self-referrals.

250.   The Medlink Defendants' pre-determined treatment protocols were designed and employed by the Medlink Defendants to maximize the potential charges that they could submit to GEICO, rather than to provide medically necessary services to the Insureds who were subjected to the protocols.

**7.   The Fraudulent and Unlawful Charges for Epidurography at Medlink**

251.   In order to maximize their fraudulent charges for the pain management injections

they purported to provide to GEICO Insureds, the Medlink Defendants frequently submitted separate charges for epidurography that supposedly was necessary to perform the injections.

252.    As set forth in Exhibit "2", the Medlink Defendants submitted their charges for epidurography under CPT code 72275, typically resulting in a charge of $750.00 for each instance when the epidurography supposedly was provided.

253.    Like the Defendants' charges for the other Fraudulent Services, the charges for epidurography were fraudulent in that the epidurography was medically unnecessary and performed – to the extent that it was performed at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocols, not to treat or otherwise benefit the Insureds.

254.    What is more, and like the Defendants' charges for the other Fraudulent Services, the charges for the epidurography were fraudulent in that they misrepresented Medlink's eligibility to collect PIP Benefits in the first instance.

255.    In fact, and as set forth herein, Medlink was never eligible to collect PIP Benefits, because it operated in violation of Florida law.

256.    Pursuant to the CPT Assistant, CPT code 72275 is used to report a diagnostic radiologic procedure for the performance, supervision, interpretation, and documentation of epidurography. CPT code 72275 should only be used when an epidurogram is performed. What is more, hardcopy images in multiple planes documenting the flow of contrast must be obtained, and a formal radiologic report must be prepared, in order to support a charge under CPT code 72275.

257.    Even so, the physicians associated with Medlink – who worked at the direction of the Medlink Defendants – routinely failed to prepare formal radiologic reports as part of their purported epidurograms.

258.    In the claims identified in Exhibit "2", the Medlink Defendants routinely and falsely

represented that they provided legitimate epidurograms concurrently with the underlying pain management injections in order to maximize the amount of fraudulent billing that they could submit to GEICO.

**8.  The Fraudulent and Unlawful Charges for MRIs at South Florida Diagnostic**

259.    Pursuant to the Defendants' unlawful self-referral scheme, Defendants Barbanell, Weinstein, Gomez, Zusmer, Chiropractic Clinics of South Florida, Barbanell PA, Weinstein PA, Gomez PA, and Zusmer PA (collectively, the "South Florida Diagnostic Defendants") also routinely caused the Insureds in the claims identified in Exhibit "3" to be subjected to medically unnecessary MRIs.

260.    Various physicians associated with South Florida Diagnostic purported to perform the MRIs at the direction of the South Florida Diagnostic Defendants.

261.    As set forth in Exhibit "3", the South Florida Diagnostic Defendants then billed the purported MRIs through South Florida Diagnostic to GEICO using CPT codes 72141, 72142, 72146, 72148, 72156, 73221, 73721, and 73722, typically resulting in charges of more than $1,000.00 for each MRI they purported to provide.

262.    In the claims identified in Exhibit "3", the charges for the MRIs were fraudulent in that they misrepresented South Florida Diagnostic's compliance with applicable law, as well as South Florida Diagnostic's eligibility to collect PIP Benefits in the first instance.

263.    The charges for the MRIs were also fraudulent in that the services were medically unnecessary.

264.    To the extent that the Insureds in the claims identified in Exhibit "3" suffered any injuries at all in their typically minor accidents, the injuries virtually always were minor soft tissue injuries such as sprains and strains.

265.    In a legitimate clinical setting, MRIs should not be used as an initial form of diagnostic testing in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

266.    For example, the American College of Radiology – an almost 100 year-old professional organization with a mission to serve patients and society by empowering members to advance the practice, science, and professions of radiological care – has indicated that MRIs are usually not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

267.    Along similar lines, the American College of Physicians – a more than 100 year-old professional organization with a mission to enhance the quality and effectiveness of health care by fostering excellence and professionalism in the practice of medicine – likewise has indicated that MRIs are usually not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

268.    In fact, in a legitimate clinical setting, patients suffering from soft tissue injuries such as strains or sprains secondary to automobile accidents generally should not receive MRIs until they complete a legitimate course of conservative treatment.

269.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and unnecessary diagnostic imaging can be counterproductive and can even be harmful to the patient.

270.    Even so, in order to maximize the amount of fraudulent PIP billing that they could submit through South Florida Diagnostic to GEICO, the South Florida Diagnostic Defendants routinely subjected Insureds to medically unnecessary MRIs as an initial form of diagnostic

imaging, shortly after the Insureds' underlying automobile accidents. This is despite the fact that the Insureds had not suffered any injuries that would warrant administering MRIs, and – in any case – had not, and could not have, legitimately tried and failed a course of conservative treatment at the time when the MRIs purportedly were provided.

271.   For example:

(i)   On January 23, 2020, the South Florida Diagnostic Defendants caused an Insured named SK to be subjected to multiple, medically unnecessary MRIs at South Florida Diagnostic, less than one month after SK's minor accident, before SK could have legitimately tried and failed a legitimate course of conservative treatment, and despite the fact that SK had not suffered any injuries that legitimately would warrant administering multiple MRIs.

(ii)   On March 1, 2020, the South Florida Diagnostic Defendants caused an Insured named ML to be subjected to multiple, medically unnecessary MRIs at South Florida Diagnostic, less than one month after ML's minor accident, before ML could have legitimately tried and failed a legitimate course of conservative treatment, and despite the fact that ML had not suffered any injuries that legitimately would warrant administering multiple MRIs.

(iii)   On April 5, 2020, the South Florida Diagnostic Defendants caused an Insured named JP to be subjected to multiple, medically unnecessary MRIs at South Florida Diagnostic, less than one month after JP's minor accident, before JP could have legitimately tried and failed a legitimate course of conservative treatment, and despite the fact that JP had not suffered any injuries that legitimately would warrant administering multiple MRIs.

(iv)   On August 23, 2020, the South Florida Diagnostic Defendants caused an Insured named II to be subjected to multiple, medically unnecessary MRIs at South Florida Diagnostic, less than one month after II's minor accident, before II could have legitimately tried and failed a legitimate course of conservative treatment, and despite the fact that II had not suffered any injuries that legitimately would warrant administering multiple MRIs.

(v)   On April 11, 2021, the South Florida Diagnostic Defendants caused an Insured named OB to be subjected to multiple, medically unnecessary MRIs at South Florida Diagnostic, less than one month after OB's minor accident, before OB could have legitimately tried and failed a legitimate course of conservative treatment, and despite the fact that OB had not suffered any injuries that legitimately would warrant administering multiple MRIs.

(vi)   On November 21, 2021, the South Florida Diagnostic Defendants caused an Insured

named PG to be subjected to multiple, medically unnecessary MRIs at South Florida Diagnostic, just one month after PG's minor accident, before PG could have legitimately tried and failed a legitimate course of conservative treatment, and despite the fact that PG had not suffered any injuries that legitimately would warrant administering multiple MRIs.

(vii)   On June 15, 2023, South Florida Diagnostic, Barbanell, Weinstein, Gomez, Chiropractic Clinics of South Florida, Barbanell PA, Weinstein PA, and Gomez PA caused an Insured named SC to be subjected to multiple, medically unnecessary MRIs at South Florida Diagnostic, less than one month after SC's minor accident, before SC could have legitimately tried and failed a legitimate course of conservative treatment, and despite the fact that SC had not suffered any injuries that legitimately would warrant administering multiple MRIs.

(viii)  On August 13, 2023, South Florida Diagnostic, Barbanell, Weinstein, Gomez, Chiropractic Clinics of South Florida, Barbanell PA, Weinstein PA, and Gomez PA caused an Insured named MM to be subjected to multiple, medically unnecessary MRIs at South Florida Diagnostic, less than one month after MM's minor accident, before MM could have legitimately tried and failed a legitimate course of conservative treatment, and despite the fact that MM had not suffered any injuries that legitimately would warrant administering multiple MRIs.

(ix)    On September 28, 2023, South Florida Diagnostic, Barbanell, Weinstein, Gomez, Chiropractic Clinics of South Florida, Barbanell PA, Weinstein PA, and Gomez PA caused an Insured named SF to be subjected to multiple, medically unnecessary MRIs at South Florida Diagnostic, less than one month after SF's minor accident, before SF could have legitimately tried and failed a legitimate course of conservative treatment, and despite the fact that SF had not suffered any injuries that legitimately would warrant administering multiple MRIs.

(x)     On March 17, 2024, South Florida Diagnostic, Barbanell, Weinstein, Gomez, Chiropractic Clinics of South Florida, Barbanell PA, Weinstein PA, and Gomez PA caused an Insured named WM to be subjected to multiple, medically unnecessary MRIs at South Florida Diagnostic, less than one month after WM's minor accident, before WM could have legitimately tried and failed a legitimate course of conservative treatment, and despite the fact that WM had not suffered any injuries that legitimately would warrant administering multiple MRIs.

272.    These are only representative examples. In the claims identified in Exhibit "3", the South Florida Diagnostic Defendants routinely subjected Insureds to medically unnecessary MRIs as an initial form of diagnostic testing, soon after the Insureds' underlying automobile accidents, and despite the fact that the Insureds had not suffered any injuries that would warrant administering

the MRIs.

273.    In the claims identified in Exhibit "3", South Florida Diagnostic, Barbanell, Weinstein, Gomez, Zusmer, Chiropractic Clinics of South Florida, Barbanell PA, Weinstein PA, Gomez PA, and Zusmer PA routinely subjected Insureds to medically unnecessary MRIs in order to provide false or exaggerated injury "diagnoses" early on in the Insureds' courses of treatment, so as to create a false justification for the other Fraudulent Services that the Defendants purported to provide.

274.    In this context, it is improbable that two or more Insureds involved in any single, relatively minor motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology as the result of their common accident.

275.    It likewise is improbable that two or more Insureds involved in any single, relatively minor motor vehicle accident not only would suffer from substantially similar injuries and symptomatology as the result of their common accident, but would also require MRIs of the same parts of their bodies as the result of the accident, at or around the same time after the accident.

276.    It is even more improbable – to the point of impossibility – that this kind of pattern legitimately would occur with great frequency within a cohort of patients receiving MRIs from a single diagnostic imaging provider such as South Florida Diagnostic.

277.    Even so – and in keeping with the fact that the MRIs in the claims identified in Exhibit "3" were provided pursuant to an unlawful self-referral scheme and pre-determined, fraudulent protocols, rather than based on medical necessity – the South Florida Diagnostic Defendants often purported to provide substantially similar, medically unnecessary MRIs, on or about the same date, to multiple Insureds who had been in the same underlying accident, oftentimes before the Insureds legitimately could have tried and failed a course of conservative treatment.

278. In the claims for MRIs identified in Exhibit "3", the South Florida Diagnostic Defendants routinely and falsely represented that the MRIs were lawfully provided and reimbursable, when, in fact, the MRIs were neither lawfully provided nor reimbursable, because the purported MRIs were medically unnecessary and because South Florida Diagnostic could not lawfully recover PIP Benefits for the purported services, inasmuch as the MRIs were provided pursuant to unlawful self-referrals and because South Florida Diagnostic operated in violation of Florida law.

### III. The Fraudulent Claims the Defendants Submitted to GEICO

279. To support their fraudulent charges, the Defendants systematically submitted thousands of HCFA-1500 forms and treatment reports to GEICO, seeking payment for the Fraudulent Services that the Defendants were not entitled to receive payment.

280. The claims that the Defendants submitted to GEICO were false and misleading in the following material respects:

(i) The HCFA-1500 forms and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with Florida law, and, therefore, were eligible to collect PIP Benefits in the first instance. In fact, the Defendants were never in compliance with Florida law and were never eligible to collect PIP Benefits, because of the fraudulent and unlawful scheme described here.

(ii) The HCFA-1500 forms and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement, because of the fraudulent and unlawful scheme described herein.

(iii) The HCFA-1500 forms and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that the Fraudulent Services were performed, the Fraudulent Services were not medically necessary and were performed as part of pre-determined fraudulent treatment and billing protocols designed to financially

enrich the Defendants, and not to provide medically necessary treatment to Insureds.

(iv)   The HCFA-1500 forms and treatment reports submitted by the Defendants uniformly misrepresented and exaggerated the nature of the Fraudulent Services that purportedly were provided.

**IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

281.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their provision of the Fraudulent Services and their submission of charges to GEICO.

282.   Even so, the Defendants knowingly misrepresented and concealed facts related to Chiropractic Clinics of South Florida, Medlink, and South Florida Diagnostic in an effort to prevent discovery of the fact that the Defendants operated in pervasive violation of Florida law, and to prevent discovery of the fact that the Fraudulent Services were medically unnecessary, illusory, and ineligible for PIP reimbursement.

283.   For instance, the Defendants submitted facially valid HCFA-1500 forms, purportedly signed and verified by properly licensed health care practitioners, in support of their fraudulent charges, and GEICO had a right to rely on this facially valid billing.

284.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to cause – and did cause – GEICO to rely on them. As a result, GEICO has incurred damages of more than $2,820,000.00.

285.   Based upon the Defendants' material misrepresentations and other affirmative acts of fraudulent concealment, GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it commenced this action.

**FIRST CAUSE OF ACTION**
**Against Chiropractic Clinics of South Florida**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

286.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

287.    There is an actual case in controversy between GEICO and Chiropractic Clinics of South Florida regarding more than $75,000.00 in fraudulent and unlawful pending billing for Fraudulent Services that have been submitted to GEICO.

288.    Chiropractic Clinics of South Florida has no right to receive payment for any pending bills submitted to GEICO because it unlawfully operated in violation of Florida law.

289.    Chiropractic Clinics of South Florida has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

290.    Chiropractic Clinics of South Florida has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the Fraudulent Services.

291.    Chiropractic Clinics of South Florida has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

292.    Chiropractic Clinics of South Florida has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent

Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

293. Accordingly, GEICO requests that this Court enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Chiropractic Clinics of South Florida has no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA,
### Weinstein, Gomez, Barbanell, and Zusmer
### (Violation of RICO – 18 U.S.C. § 1962(c))

294. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

295. Chiropractic Clinics of South Florida is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

296. Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer knowingly have conducted and/or participated in, directly or indirectly, the conduct of the Chiropractic Clinics of South Florida's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over four years, seeking payments that Chiropractic Clinics of South Florida was not eligible to receive under the No-Fault Law, because: (i) Chiropractic Clinics of South Florida unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment; (iv) in many cases, the Fraudulent Services

were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

297. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

298. Chiropractic Clinics of South Florida's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer operated Chiropractic Clinics of South Florida, inasmuch as Chiropractic Clinics of South Florida was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for Chiropractic Clinics of South Florida to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Chiropractic Clinics of South Florida to the present day.

299. Chiropractic Clinics of South Florida is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Chiropractic Clinics of South Florida in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

300. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,169,000.00 pursuant to the fraudulent bills

submitted through Chiropractic Clinics of South Florida.

301.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**THIRD CAUSE OF ACTION**
**Against Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA,**
**Weinstein, Gomez, Barbanell, and Zusmer**
**(Violation of RICO – 18 U.S.C. § 1962(d))**

302.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

303.    Chiropractic Clinics of South Florida is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

304.    Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Chiropractic Clinics of South Florida's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over four years, seeking payments that Chiropractic Clinics of South Florida was not entitled to receive under the No-Fault Law, because: (i) Chiropractic Clinics of South Florida unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment; (iv) in many cases, the Fraudulent Services were never provided in the first instance;

and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

305. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

306. Chiropractic Clinics of South Florida's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer have operated Chiropractic Clinics of South Florida, inasmuch as Chiropractic Clinics of South Florida is not engaged in a legitimate health care practice, and acts of mail fraud are, therefore, essential in order for Chiropractic Clinics of South Florida to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Chiropractic Clinics of South Florida to the present day.

307. Chiropractic Clinics of South Florida is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Chiropractic Clinics of South Florida in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

308. Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez,

Barbanell, and Zusmer knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

309.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,169,000.00 pursuant to the fraudulent bills submitted through Chiropractic Clinics of South Florida.

310.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

## FOURTH CAUSE OF ACTION
### Against Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer
### (Common Law Fraud)

311.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

312.    Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through Chiropractic Clinics of South Florida for the Fraudulent Services.

313.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Chiropractic Clinics of South Florida was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, Chiropractic Clinics of South Florida was not in compliance with Florida Law and was not eligible to collect PIP Benefits; (ii) in every claim, the representation that the

Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the

Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii)

in every claim, the representation that the Fraudulent Services were medically necessary, when, in

fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the

representation that the Fraudulent Services were actually performed, when, in many cases, the

Fraudulent Services were not actually performed.

314.    Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA,

Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer intentionally made the above-described

false and fraudulent statements, and also concealed material facts, in a calculated effort to induce

GEICO to pay charges submitted through Chiropractic Clinics of South Florida that were not

reimbursable.

315.    GEICO justifiably relied on these false and fraudulent representations and acts of

fraudulent concealment, and as a proximate result, has been injured in its business and property by

reason of the above-described conduct, in that it has paid at least $2,169,000.00 pursuant to the

fraudulent bills that were submitted through Chiropractic Clinics of South Florida.

316.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral

turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

317.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and

punitive damages, together with interest and costs, along with such other and further relief as this

Court deems just, proper, and equitable.

**FIFTH CAUSE OF ACTION**
**Against Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA,**
**Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer**
**(Under Fla. Stat. §§ 501.201 et seq.)**

318.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1-285, above.

319.    Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer are actively engaged in trade and commerce in the State of Florida.

320.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

321.    Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

322.    The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were unfair, deceptive, and unconscionable in that they misrepresented: (i) Chiropractic Clinics of South Florida's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

323.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer has been materially injurious to GEICO and its Insureds.

324.    The conduct of Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Weinstein, Gomez, Barbanell, and Zusmer was the actual and proximate cause of the damages sustained by GEICO.

325.    Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA,

Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer's unfair and deceptive acts have caused GEICO to sustain damages of at least $2,169,000.00.

326.    By reason of Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees.

### SIXTH CAUSE OF ACTION
### Against Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer
### (Unjust Enrichment)

327.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

328.    As set forth herein, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

329.    When GEICO paid the bills and charges submitted by Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer through Chiropractic Clinics of South Florida, it reasonably believed that it was legally obligated to make such payments based on Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer's improper, unlawful, and/or unjust acts.

330.    Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

331.    Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

332.    By reason of the above, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,169,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Medlink**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

333.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

334.    There is an actual case in controversy between GEICO and Medlink regarding more than $75,000.00 in fraudulent and unlawful pending billing for the Fraudulent Services that have been submitted to GEICO.

335.    Medlink has no right to receive payment for any pending bills submitted to GEICO because it unlawfully operated in violation of Florida law.

336.    Medlink has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

337.    Medlink has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the Fraudulent Services.

338.     Medlink has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

339.     Medlink has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

340.     Accordingly, GEICO requests that this Court enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Medlink has no right to receive payment for any pending bills submitted to GEICO.

**EIGHTH CAUSE OF ACTION**
**Against Weinstein, Gomez, and Barbanell**
**(Violation of RICO – 18 U.S.C. § 1962(c))**

341.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

342.     Medlink is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

343.     Weinstein, Gomez, and Barbanell knowingly have conducted and/or participated in, directly or indirectly, the conduct of the Medlink's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit hundreds of fraudulent charges on a continuous basis for over four years, seeking payments that Medlink was not eligible to receive under the No-Fault Law, because: (i) Medlink unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent

Services were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

344.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

345.    Medlink's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Weinstein, Gomez, and Barbanell operated Medlink, inasmuch as Medlink was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for Medlink to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Medlink to the present day.

346.    Medlink is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Medlink in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

347.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $221,000.00 pursuant to the fraudulent bills submitted through Medlink.

348. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**NINTH CAUSE OF ACTION**
**Against Weinstein, Gomez, and Barbanell**
**(Violation of RICO – 18 U.S.C. § 1962(d))**

349. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

350. Medlink is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

351. Weinstein, Gomez, and Barbanell knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Medlink's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit hundreds of fraudulent charges on a continuous basis for over four years, seeking payments that Medlink was not entitled to receive under the No-Fault Law, because: (i) Medlink unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

352. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

353. Medlink's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Weinstein, Gomez, and Barbanell have operated Medlink, inasmuch as Medlink is not engaged in a legitimate health care practice, and acts of mail fraud are, therefore, essential in order for Medlink to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Medlink to the present day.

354. Medlink is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Medlink in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

355. Weinstein, Gomez, and Barbanell knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

356. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $221,000.00 pursuant to the fraudulent bills submitted through Medlink.

357. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

<u>TENTH CAUSE OF ACTION</u>
**Against Medlink, Weinstein, Gomez, and Barbanell**
**(Common Law Fraud)**

358.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

359.   Medlink, Weinstein, Gomez, and Barbanell intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through Medlink for the Fraudulent Services.

360.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Medlink was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, Medlink was not in compliance with Florida Law and was not eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

361.   Medlink, Weinstein, Gomez, and Barbanell intentionally made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through Medlink that were not reimbursable.

362.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $221,000.00 pursuant to the fraudulent bills that were submitted through Medlink.

363.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

364.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### ELEVENTH CAUSE OF ACTION
**Against Medlink, Weinstein, Gomez, and Barbanell**
**(Under Fla. Stat. §§ 501.201 et seq.)**

365.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

366.     Medlink, Weinstein, Gomez, and Barbanell are actively engaged in trade and commerce in the State of Florida.

367.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

368.     Weinstein, Gomez, Barbanell, Zusmer, and Medlink engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

369.     The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were unfair, deceptive, and unconscionable in that they misrepresented: (i) Medlink's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically

necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

370.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Medlink, Weinstein, Gomez, and Barbanell has been materially injurious to GEICO and its Insureds.

371.   The conduct of Medlink, Weinstein, Gomez, and Barbanell was the actual and proximate cause of the damages sustained by GEICO.

372.   Medlink, Weinstein, Gomez, and Barbanell's unfair and deceptive acts have caused GEICO to sustain damages of at least $221,000.00.

373.   By reason of Medlink, Weinstein, Gomez, and Barbanell's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees.

### TWELFTH CAUSE OF ACTION
### Against Medlink, Weinstein, Gomez, and Barbanell
### (Unjust Enrichment)

374.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

375.   As set forth herein, Weinstein, Gomez, Barbanell, and Medlink have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

376.   When GEICO paid the bills and charges submitted by Weinstein, Gomez, and Barbanell through Medlink, it reasonably believed that it was legally obligated to make such payments based on Weinstein, Gomez, Barbanell, and Medlink's improper, unlawful, and/or unjust acts.

377.   Weinstein, Gomez, Barbanell, and Medlink have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Weinstein, Gomez, Barbanell, and Medlink voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing

scheme.

378.    Weinstein, Gomez, Barbanell, and Medlink's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

379.    By reason of the above, Weinstein, Gomez, Barbanell, and Medlink have been unjustly enriched in an amount to be determined at trial, but in no event less than $221,000.00.

**THIRTEENTH CAUSE OF ACTION**
**Against South Florida Diagnostic**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

380.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

381.    There is an actual case in controversy between GEICO and South Florida Diagnostic regarding more than $75,000.00 in fraudulent and unlawful pending billing for the Fraudulent Services that have been submitted to GEICO.

382.    South Florida Diagnostic has no right to receive payment for any pending bills submitted to GEICO because it unlawfully operated in violation of Florida law.

383.    South Florida Diagnostic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

384.    South Florida Diagnostic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the Fraudulent Services.

385.    South Florida Diagnostic has no right to receive payment for any pending bills

submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

386.    South Florida Diagnostic has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

387.    Accordingly, GEICO requests that this Court enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that South Florida Diagnostic has no right to receive payment for any pending bills submitted to GEICO.

## FOURTEENTH CAUSE OF ACTION
### Against Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA
### (Violation of RICO – 18 U.S.C. § 1962(c))

388.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

389.    South Florida Diagnostic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

390.    Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA knowingly have conducted and/or participated in, directly or indirectly, the conduct of the South Florida Diagnostic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit hundreds of fraudulent charges on a continuous basis for over four years, seeking payments that South Florida Diagnostic was not eligible to receive under the No-Fault Law, because: (i) South Florida Diagnostic unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not

lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

391.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

392.   South Florida Diagnostic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA operated South Florida Diagnostic, inasmuch as South Florida Diagnostic was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for South Florida Diagnostic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through South Florida Diagnostic to the present day.

393.   South Florida Diagnostic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by South Florida Diagnostic in pursuit of

inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

394.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $432,000.00 pursuant to the fraudulent bills submitted through South Florida Diagnostic.

395.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

### FIFTEENTH CAUSE OF ACTION
**Against Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA (Violation of RICO – 18 U.S.C. § 1962(d))**

396.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

397.    South Florida Diagnostic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

398.    Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of South Florida Diagnostic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit hundreds of fraudulent charges on a continuous basis for over four years, seeking payments that South Florida Diagnostic was not entitled to receive under the No-Fault Law, because: (i) South Florida Diagnostic unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent

Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

399.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

400.    South Florida Diagnostic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer have operated South Florida Diagnostic, inasmuch as South Florida Diagnostic is not engaged in a legitimate health care practice, and acts of mail fraud are, therefore, essential in order for South Florida Diagnostic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through South Florida Diagnostic to the present day.

401.    South Florida Diagnostic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by South Florida Diagnostic in pursuit of

inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

402.    Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

403.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $432,000.00 pursuant to the fraudulent bills submitted through South Florida Diagnostic.

404.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**SIXTEENTH CAUSE OF ACTION**
**Against South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic**
**Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA**
**(Common Law Fraud)**

405.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

406.    South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through South Florida Diagnostic for the Fraudulent Services.

407.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that South Florida Diagnostic was in

compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, South Florida Diagnostic was not in compliance with Florida Law and was not eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

408.    South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA intentionally made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through South Florida Diagnostic that were not reimbursable.

409.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $432,000.00 pursuant to the fraudulent bills that were submitted through South Florida Diagnostic.

410.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

411.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## SEVENTEENTH CAUSE OF ACTION
### Against South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA
### (Under Fla. Stat. §§ 501.201 et seq.)

412.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

413.    South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA are actively engaged in trade and commerce in the State of Florida.

414.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

415.    South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

416.    The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were unfair, deceptive, and unconscionable in that they misrepresented: (i) South Florida Diagnostic's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

417.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA has been materially injurious to GEICO and its Insureds.

418.    The conduct of South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer,

Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA was the actual and proximate cause of the damages sustained by GEICO.

419.    South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA's unfair and deceptive acts have caused GEICO to sustain damages of at least $432,000.00.

420.    By reason of South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees.

## EIGHTEENTH CAUSE OF ACTION
### Against South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA
### (Unjust Enrichment)

421.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-285, above.

422.    As set forth herein, South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

423.    When GEICO paid the bills and charges submitted by South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA through South Florida Diagnostic, it reasonably believed that it was legally obligated to make such payments based on South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA's improper, unlawful, and/or unjust acts.

424.    South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic

Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

425.    South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

426.    By reason of the above, South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA have been unjustly enriched in an amount to be determined at trial, but in no event less than $432,000.00.

**JURY DEMAND**

427.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Chiropractic Clinics of South Florida, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Chiropractic Clinics of South Florida has no right to receive payment for any pending bills submitted to GEICO.

B.    On the Second Cause of Action against Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer, compensatory damages in favor of

GEICO in an amount to be determined at trial but in excess of $2,169,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

      C.     On the Third Cause of Action against Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,169,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

      D.     On the Fourth Cause of Action against Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,169,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

      E.     On the Fifth Cause of Action against Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,169,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

      F.     On the Sixth Cause of Action against Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, Zusmer PA, Weinstein, Gomez, Barbanell, and Zusmer, more than $2,169,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

      G.     On the Seventh Cause of Action against Medlink, a declaration pursuant to the

Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Medlink has no right to receive payment for any pending bills submitted to GEICO.

H.      On the Eighth Cause of Action against Weinstein, Gomez, and Barbanell, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $221,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

I.      On the Ninth Cause of Action against Weinstein, Gomez, and Barbanell, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $221,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

J.      On the Tenth Cause of Action against Medlink, Weinstein, Gomez, and Barbanell, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $221,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

K.      On the Eleventh Cause of Action against Medlink, Weinstein, Gomez, and Barbanell, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $221,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

L.      On the Twelfth Cause of Action against Medlink, Weinstein, Gomez, and Barbanell, more than $221,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

M.      On the Thirteenth Cause of Action against South Florida Diagnostic, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that South Florida Diagnostic has no right to receive payment for any pending bills submitted to GEICO.

N.      On the Fourteenth Cause of Action against Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $432,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

O.      On the Fifteenth Cause of Action against Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $432,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

P.      On the Sixteenth Cause of Action against South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $432,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Q.      On the Seventeenth Cause of Action against South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA, compensatory damages in favor of GEICO in an amount to be

determined at trial but in excess of $432,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

        R.        On the Eighteenth Cause of Action against South Florida Diagnostic, Weinstein, Gomez, Barbanell, Zusmer, Chiropractic Clinics of South Florida, Weinstein PA, Gomez PA, Barbanell PA, and Zusmer PA, more than $432,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated: Jacksonville, Florida
       December 3, 2025

                                    /s/ Max Gershenoff

                                 Max Gershenoff (FBN 1038855)
                                 John P. Marino (FBN 814539)
                                 Lindsey R. Trowell (FBN 678783)
                                 Christina M. Bezas (FBN 1038951)
                                 Kristen Wenger (FBN 92136)
                                 RIVKIN RADLER LLP
                                 1301 Riverplace Blvd., 10th Floor
                                 Jacksonville, Florida 32207
                                 Phone: (904) 792-8925

                                 -and-

                                 926 RXR Plaza
                                 Uniondale, New York 11550
                                 Phone: (516) 357-3000
                                 Max.Gershenoff@rivkin.com
                                 John.Marino@rivkin.com
                                 Lindsey.Trowell@rivkin.com
                                 Christina.Bezas@rivkin.com
                                 Kristen.Wenger@rivkin.com

                                 *Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co.*

100